846 P.2d 312

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Ralph HERNANDEZ, Defendant– Appellant,**

No. 19728.

Supreme Court of New Mexico.

Jan. 14, 1993.

Robert J. Jacobs, Taos, for defendant-appellant.

Tom Udall, Atty. Gen., Gail MacQuesten, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

BACA, Justice.

Defendant Ralph Hernandez appeals his conviction on charges of first degree felony murder, aggravated burglary, attempted robbery, and battery. Because Defendant was sentenced to life imprisonment for the

first degree murder conviction,[1] we note jurisdiction under SCRA 1986, 12–102(A)(2) (Repl.Pamp.1992).

Defendant raises numerous issues that he contends mandate a reversal including: (1) Whether he was denied effective assistance of counsel; (2) whether the trial court erred when it refused to grant Defendant's motion for a continuance in order to allow additional time for his trial counsel to prepare; (3) whether the trial court erred by failing to exclude testimony of a prosecution witness who was present during other prosecution witnesses' testimony; (4) whether the trial court erred when it admitted various photographs and a videotape; (5) whether the trial court erred by denying Defendant's motion for recusal; (6) whether the trial court erred when it refused to order the sheriff to bring a potential juror to court for jury duty; (7) whether the trial court erred when it denied Defendant's motion for a change of venue; (8) whether the trial court erred when it denied Defendant's challenges for cause of various potential jurors; (9) whether the trial court erred when it informed the jury that the State would not seek the death penalty; (10) whether the trial court erred when it gave the felony murder instruction to the jury; (11) whether the trial court erred when it qualified one of the State's expert witnesses; (12) whether the trial court erred when it denied Defendant's motion in limine and motion for a continuance based on prosecutorial misconduct; (13) whether the trial court erred when it failed to rule on the sufficiency of the evidence prior to submitting the case to the jury; (14) whether there was sufficient evidence to convict Defendant; and (15) whether Defendant was denied his right to a fair trial because of cumulative error. We find no merit to any of Defendant's arguments and affirm.

## I

On April 18, 1989, officers from the Silver City Police Department discovered a woman's body in an apartment in Silver City. The body, which was later identified as that of Peggy Brown, was found lying on the bedroom floor of the apartment. Dark hairs that did not appear to match Brown's hairs were found in her mouth and on the bed. The police also found blood on her bed, pillows, sheets, and clothing. Brown's purse and its contents were scattered about on the living room floor. Brown's body had a black eye, a bloody nose, several bruises, and a cut lip. The bedroom was in a state of disarray that suggested that a struggle had ensued before Brown's death. The police took pictures of the position and condition of the body and of the interior and exterior of the apartment and recorded a videotape of the apartment. In addition, the police lifted fingerprints and palmprints from the apartment and Brown's purse.

On August 8, 1989, David Salaiz contacted the police with information regarding Brown's murder. Salaiz told the police that he had been drinking with Defendant when Defendant related the following story to Salaiz. According to Salaiz, Defendant stated that he had needed money to purchase drugs, entered Brown's apartment looking for something that he could sell, encountered Brown, who began to scream, struggled with Brown, and suffocated Brown with a pillow. Defendant then told Salaiz that no one else knew of his involvement in the murder, and that, consequently, he would have to kill Salaiz. Salaiz claimed that Defendant pulled a knife, and a fight, in which Salaiz was cut, ensued. Salaiz eluded Defendant and contacted the police, who investigated Salaiz's story. The police found blood at the location where Salaiz claims that Defendant attacked him.

The police then contacted Defendant and, with his permission, obtained a hair sample from him. This sample was sent to the FBI and compared with the hairs found in

---

1. In addition to the life sentence for murder, defendant was sentenced to 9 years imprisonment plus two years enhancement for the aggravated burglary, eighteen months imprisonment for the attempted robbery, and six months imprisonment for the battery. The aggravated burglary sentence runs consecutively with the murder sentence and the other sentences run concurrently with the murder sentence.

Brown's apartment. The FBI determined that the hairs found in Brown's apartment had been forcibly removed and were a microscopic match with the hair sample taken from Defendant. On the basis of Salaiz's statement and the hair analysis, the Silver City police obtained a warrant for Defendant's arrest and, after his arrest, he was charged with murder, aggravated burglary, attempted robbery, and battery regarding the incident at Brown's apartment and aggravated battery of Salaiz. A lawyer was appointed to represent Defendant, who was indigent.

Prior to trial, defense counsel made numerous motions, the most important of which was his motion for a continuance. In making this motion, defense counsel contended that he and Defendant's expert witnesses needed additional time to prepare for trial. Defendant also moved to exclude the testimony of Detective Bruce, contending that Bruce's testimony was tainted because he was allowed, over objection, to listen to other witnesses' testimony at a preliminary hearing. In addition, Defendant moved to exclude the photographs and videotape of Brown's apartment, contending that the prejudicial nature of this evidence outweighed its probative value. Over two months prior to trial, the trial court heard these motions and, with the exception of excluding some of the photographs as cumulative, denied Defendant relief.

One week prior to trial, Defendant again moved for a continuance to allow his counsel and expert witness additional time to prepare for trial. Defense counsel claimed that the Public Defender's office had not provided the necessary funds to hire cocounsel familiar with scientific evidence, a forensics expert, or a hair analysis expert. Defense counsel also claimed that he needed additional time to locate two witnesses who he claimed could provide Defendant with an alibi. In addition, Defendant wanted to delay his trial until after the DNA analysis from another murder case was available. After the trial court denied this motion, Defendant moved to recuse the judge, whose mother was a friend of the victim. This motion was also denied.

Defendant's trial began on October 29, 1990. Prior to voir dire and over objection of defense counsel, the court informed the jury venire that the State would not be seeking the death penalty. During voir dire, many of the potential jurors indicated that they had heard publicity regarding the case; however, most said that they could not remember what they had heard. After voir dire, Defendant moved for a change of venue, and the trial court denied the motion.

At trial the following evidence, viewed in the light most favorable to upholding the verdict, *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988), was introduced. Medical testimony indicated that Brown had been killed on either Sunday night, April 16, 1989, or the following morning and that Brown had probably died from suffocation. The State's main witness, David Salaiz, testified that Defendant had admitted to him (Salaiz) that he (Defendant) had entered Brown's apartment to find something to sell to enable Defendant to purchase drugs, encountered Brown, who screamed, and killed Brown by suffocating her with a pillow. Salaiz testified that after Defendant finished telling the story, he became violent and attacked Salaiz with a knife. Salaiz testified that he subdued Defendant, went to the police, gave details about Defendant's story, and submitted a signed statement. On cross-examination, Salaiz testified that he had been given a reward for coming forward with information regarding the murder. In addition, he testified that he had previously been convicted of attempted criminal sexual contact of a minor, possession of cocaine, and larceny and that other charges were currently pending against him. Salaiz's testimony was partially corroborated by Silver City police officer Hall, who testified that he found a trail of blood in the Murray Hotel where Salaiz claims that Defendant attacked him.

The State also introduced hair identification evidence, which linked Defendant to Brown's murder. Arnold Bentz, who, over Defendant's objection, was qualified as an expert witness based on job experience,

testified that he had separated the hairs collected at the crime scene into those matching the victim's hair and those not matching the victim's hair. Doug Diedrick, an expert in hair identification, testified that the hair samples taken from Defendant microscopically matched the hairs collected at Brown's apartment. Both Bentz and Diedrick testified on cross-examination that hair identification could not positively identify someone.

The State also introduced forensic evidence collected at Brown's apartment. James Bell, a forensic serologist, testified that numerous items found in Brown's apartment tested positive for the presence of blood. On cross-examination, Bell testified that the blood had not been type checked or compared to the blood of Brown, Defendant, or any other suspect. The State also introduced evidence that DNA testing was inconclusive.

At the close of the State's evidence, Defendant offered testimony that attacked Salaiz's credibility. In addition, Defendant offered testimony that attempted to establish an alibi for Sunday night, April 16. Further, Defendant offered testimony that tended to rebut Salaiz's account of Defendant's assault on him.

After Defendant rested and prior to the jury being instructed, Defendant objected to the felony murder instruction, arguing that this charge was not supported by the evidence. The trial court overruled the objection and instructed the jury on first degree willful and deliberate murder, first degree felony murder, second degree murder, aggravated burglary, attempted robbery, battery, and aggravated battery. The jury found Defendant guilty of felony murder, aggravated burglary, attempted robbery and battery and not guilty of aggravated assault of Salaiz. This appeal ensued.

## II

The most important issue that Defendant raises in this appeal is whether he was denied effective assistance of counsel in violation of the Fourteenth Amendment to the United States Constitution and Article II, Section 14 of the New Mexico Constitution. A closely related issue, which we address first, is whether the trial court erred when it failed to grant Defendant a continuance to allow his counsel more time to prepare his defense and to obtain expert witnesses.

### A

Defendant contends that the trial court erred when it denied his motion for a continuance. Prior to trial, Defendant's trial counsel sought a continuance to obtain an expert on hair analysis, to obtain co-counsel knowledgeable in scientific evidence, to develop a defense based on a DNA analysis in another pending murder case, and to allow his expert witness more time to prepare forensic evidence. Citing *Peralta v. State,* 111 N.M. 667, 808 P.2d 637 (1991), Defendant argues that the trial court erred in denying his motion for a continuance to allow his counsel and forensics expert more time to prepare because their failure to be prepared was not chargeable to Defendant. Defendant also cites *March v. State,* 105 N.M. 453, 734 P.2d 231 (1987), to support his contention that the trial court's denial of his motion for a continuance deprived him of a potential avenue of defense. Finally, Defendant cites *State v. Brazeal,* 109 N.M. 752, 790 P.2d 1033 (Ct.App.), *cert. denied,* 109 N.M. 631, 788 P.2d 931 (1990), for the proposition that the denial of his motion for a continuance created a presumption of ineffective assistance of counsel.

■ Defendant first contends that he was deprived of a potential avenue of defense because his forensic expert witness did not have adequate time to prepare her evidence and testimony. Defendant asserts that he was unable to obtain an expert witness prior to moving for a continuance because, until just before he made his motion for a continuance, the public defender's office had failed to provide funding for the expert witness. Citing *Peralta,* Defendant argues that the public defender's office failure to fund a forensics expert should not be imputed to him.

Defendant's reliance on *Peralta*, however, is misplaced. In *Peralta*, the defendant was convicted in metropolitan court of driving under the influence of alcohol and other related traffic violations. The defendant appealed his conviction to the district court, which, after refusing to grant the defendant's motion for a continuance, dismissed the appeal when the defendant and his counsel appeared at the hearing and were not prepared to proceed. On appeal, we reversed, holding that "justice and fairness preclude dismissal [of an appeal as of right] based upon a court appointed public defender's lack of preparedness." *Peralta*, 111 N.M. at 668, 808 P.2d at 638. The issue in *Peralta* was not whether the trial court abused its discretion by denying the motion for a continuance, but whether the trial court erred in dismissing the appeal for a lack of the preparedness of the defendant's counsel. *Id.* In *Peralta*, we suggested that reversal of a conviction is not necessarily required when appointed counsel, who claimed to be inadequately prepared, proceeded to trial and presented an effective defense. *See Peralta*, 111 N.M. at 668–69, 808 P.2d at 638–39 (citing *State v. Lucero*, 104 N.M. 587, 725 P.2d 266 (Ct.App.1986) (affirming denial of motion to dismiss appointed counsel where representation found to be effective); *State v. Maes*, 100 N.M. 78, 665 P.2d 1169 (Ct.App. 1983) (same)). Like the defendants in *Lucero* and *Maes*, Defendant in the instant case proceeded to trial and presented an adequate defense. *See* Section II–B, *infra*. Thus, *Peralta* is inapposite to the case at bar.

█ Defendant also contends that the trial court erred when it failed to grant his motion for a continuance because it denied him effective assistance of counsel. As Defendant concedes, the denial of a motion for a continuance rests within the sound discretion of the trial court. *State v. Pruett*, 100 N.M. 686, 687, 675 P.2d 418, 419 (1984). The burden of establishing an abuse of discretion rests with Defendant. *See March*, 105 N.M. at 455, 734 P.2d at 233. Only in extraordinary instances will the denial of a continuance create a presumption of ineffective assistance of coun-

sel. *See Brazeal*, 109 N.M. at 756, 790 P.2d at 1037 (" '[O]nly an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.' " (quoting *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983))).

[A]ppellate courts will not presume denial of effective assistance of counsel because of the trial judge's refusal to grant a continuance unless, under the circumstances, "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."

*Id.* (quoting *United States v. Cronic*, 466 U.S. 648, 659–60, 104 S.Ct. 2039, 2047–48, 80 L.Ed.2d 657 (1984)).

█ In determining whether the denial of a continuance raises a presumption of ineffective assistance of counsel, we examine the circumstances surrounding the continuance motion to determine whether the defendant would have necessarily been prejudiced by the denial. *Id.* 109 N.M. at 756–57, 790 P.2d at 1037–38. Factors that we consider include, but are not limited to, the amount of time available to prepare a defense, the complexity of the issues involved in the case, the experience of trial counsel, and the reasons proffered by trial counsel for requesting a continuance. *Id.* If the denial of a continuance precludes the defendant from raising a potential avenue of defense, a presumption of prejudice is appropriate. *See March*, 105 N.M. at 455–56, 734 P.2d at 233–34; *see also Brazeal*, 109 N.M. at 757, 790 P.2d at 1038.

Defendant contends that the trial court's denial of his motion for a continuance deprived him of a likely defense, thereby raising a presumption of ineffective assistance of counsel. Defendant asserts that, in the absence of a continuance, his counsel was unable to obtain an expert witness on hair analysis or to obtain co-counsel familiar with scientific evidence. Defendant also contends that the denial of his continuance motion deprived his forensic expert witness

of the opportunity to analyze the evidence and prepare for trial. Defendant asserts that assistance in these areas was especially critical to his defense because the only evidence introduced to convict him was the testimony of Salaiz and the hair analysis. Defendant claims that forensic evidence could have disproved Salaiz's story and that a hair expert could have discredited the State's hair evidence, which linked Defendant to Brown's murder. In addition, Defendant contends that, because his motion for a continuance was denied, he was unable to obtain DNA results from another murder case in which Amy Sanchez, an elderly woman, was raped and killed. His defense theory was that whoever had raped and murdered Sanchez had also murdered, and possibly raped, Brown. Defendant, citing *March*, concludes that the trial court's denial of his continuance motion deprived him of a potential avenue of defense.

In *March*, defense counsel, who had been appointed less than one month earlier, moved for a continuance on the day before the defendant's second trial for burglary to permit a forensic evaluation to determine whether or not the defendant could raise the defense of a lack of capacity to form specific intent. At a hearing regarding the continuance motion, defense counsel presented evidence that, at the time of the burglary, the defendant had suffered from uncontrollable behavioral outbreaks and schizophrenia. Additional evidence showed that the defendant suffered from hypoglycemia and had had a cancerous brain tumor surgically removed three months prior to the trial date. This evidence suggested that the defendant may have had the tumor when he allegedly committed the burglary. The trial court denied the defendant's continuance motion, ruled that the medical evidence presented at the continuance hearing would be inadmissible at trial, and granted the State's motion to exclude any reference to schizophrenia and the brain tumor. *March*, 105 N.M. at 454–56, 734 P.2d at 232–34. After the defendant was convicted, he appealed. We reversed, holding that "[t]he end result of the trial court's rulings was to completely deprive

defendant of any potential defense of incapacity," thereby denying the defendant his right to due process. *Id.* at 456, 734 P.2d at 234.

The instant case, however, is distinguishable from *March*. Unlike the defendant in *March*, Defendant in the instant case was not deprived of a potential avenue of defense. Defense counsel in the instant case was appointed one year prior to trial and had adequate time and opportunity to prepare a defense. While Defendant complains that, in the absence of a hair identification expert, his counsel was unable to refute the State's hair identification evidence, the record shows that counsel adequately attacked that evidence. During cross-examination of the State's expert witnesses on hair identification, defense counsel established that hair analysis could not absolutely prove identity. Thus, defense counsel adequately placed the State's identification evidence into question.

Defendant also asserts that the denial of his continuance motion precluded him from exploring other possible defenses requiring the expertise of a forensic expert. Perhaps Defendant's forensics expert, Dr. Griest, could cast doubt on Salaiz's testimony that he had had an altercation with Defendant after confessing to the murder by analyzing the blood splatters at the scene of the altercation, the Murray Hotel. Perhaps Griest could narrow the time when the victim was murdered to a period of time during which Defendant had an alibi. Perhaps the DNA testing from the Sanchez case would exonerate Defendant in that case and allow him to argue that whoever raped and killed Sanchez had also killed Brown. Unlike the defendant in *March*, however, Defendant in the instant case was unable to show, after nearly a year of investigation, that any of these defense theories had any reasonable possibility of success. Thus, the instant case is distinguishable from *March*, in which the trial court rulings completely deprived the defendant of a potential avenue of defense, incapacity. 105 N.M. at 456, 734 P.2d at 234.

Defendant also contends that the trial court erred in denying his continuance motion because his inexperienced trial counsel needed more time to prepare and required assistance from more experienced counsel due to the complex issues involved in this case. He asserts that an examination of the factors enunciated in *Brazeal* support his conclusion that his counsel should be presumed to be ineffective. A close examination of *Brazeal*, however, shows that it supports the opposite conclusion. As in *Brazeal*, we consider factors such as the amount of time available to prepare a defense, the complexity of the issues involved in the case, the experience of trial counsel, and the reasons proffered by trial counsel for requesting a continuance. 109 N.M. at 756–57, 790 P.2d at 1037–38.

In beginning this inquiry, we again note that defense counsel in the instant case had adequate time, almost one year, to prepare his case. *See id.* (appointment of counsel less than one week prior to trial, without more, insufficient to raise presumption of ineffective assistance of counsel).[2] While Defendant contends that his trial counsel was inexperienced and needed co-counsel to adequately prepare a defense, we have never held that a defendant was constitutionally entitled to more than one attorney. *See State v. Chamberlain*, 112 N.M. 723, 733–34, 819 P.2d 673, 683–84 (1991) (refusing to hold that more than one attorney constitutionally required even in complex case carrying serious consequences for the defendant if convicted). Moreover, even though Defendant's trial counsel was inexperienced, we cannot conclude that, under the circumstances of this case, " 'the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.' " *Brazeal*, 109 N.M.

at 756, 790 P.2d at 1037 (quoting *Cronic*, 466 U.S. at 659–60, 104 S.Ct. at 2047). Thus, a presumption of ineffective assistance is not raised by the trial court's denial of Defendant's motion for a continuance. In addition, the trial court did not abuse its broad discretion in denying the motion for a continuance. *See Pruett*, 100 N.M. at 687, 675 P.2d at 419.

### B

Because Defendant has failed to show that his trial counsel's performance should be presumed to be ineffective, he must show that his counsel's actual performance at trial was ineffective. *See Brazeal*, 109 N.M. at 757, 790 P.2d at 1038. For many of the same reasons that he asserted that the denial of his continuance motion was error, Defendant asserts that his trial counsel was ineffective: (1) the Public Defender failed to provide funds to hire expert witnesses prior to trial; (2) his trial counsel was inexperienced and unprepared for trial; and (3) his trial counsel was unable to obtain co-counsel to assist in analyzing scientific evidence and prepare for cross-examination of expert witnesses. He asserts that these errors and omissions, taken together, show that his trial counsel failed to exercise the skill, judgment, and diligence of a reasonably competent attorney.

To prevail on his claim of ineffective assistance of counsel, however, Defendant bears the burden of showing both that his attorney's performance fell below that of a reasonably competent attorney, and that, as a result of his attorney's incompetence, he suffered prejudice. *State v. Gonzales*, 113 N.M. 221, 229–30, 824 P.2d 1023, 1031–32 (1992). Absent a showing of both incompetence and prejudice, counsel is presumed competent. *State v. Jett*, 111 N.M. 309, 315, 805 P.2d 78, 84 (1991). On re-

**2.** *Brazeal* cites numerous cases supporting this conclusion, including *Avery v. Alabama*, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940) (capital conviction affirmed where defense counsel appointed less than three days before trial); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (counsel not ineffective even though defendant did not meet him until minutes before retrial); *United States v. Rodg-*

*ers*, 755 F.2d 533 (7th Cir.) (no presumption of prejudice when counsel appointed two days before jury selection and four days before trial), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985); *State v. Nieto*, 78 N.M. 155, 429 P.2d 353 (1967) (conviction upheld even though continuance denied when counsel employed six days prior to trial).

view, we need not consider the two prongs of the test in any particular order.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies * * *. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

*Brazeal*, 109 N.M. at 758, 790 P.2d at 1039 (alterations in original) (quoting *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984)).

In determining whether a defendant suffered prejudice for any acts or omissions of his trial counsel, we examine the record to see if there is "a reasonable probability that 'but for' counsel's unprofessional error, the result of the proceeding would have been different." *State v. Taylor*, 107 N.M. 66, 73, 752 P.2d 781, 788 (1988) (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068), *overruled on other grounds, Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 731, 779 P.2d 99, 108 (1989). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Brazeal*, 109 N.M. at 758, 790 P.2d at 1039 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068).

Defendant points to numerous acts and omissions of his trial counsel related to the trial court's failure to grant his continuance motion that he contends establish ineffective assistance of counsel: defense counsel failed to obtain an expert witness on forensics, hair analysis, or fingerprints; defense counsel and the Public Defender's Office failed to provide co-counsel knowledgeable about scientific evidence; defense counsel was inexperienced and unprepared for trial; and defense counsel had not adequately investigated the case. Defendant, however, has not demonstrated, nor have we discerned, prejudice resulting from these alleged deficiencies by trial counsel.

■ Defendant first complains that his trial counsel failed to employ experts in the area of hair analysis, forensics, and fingerprint analysis. Assuming arguendo that competent trial counsel would have employed experts in these areas, Defendant has not shown that "that 'but for' counsel's unprofessional error, the result of the proceeding would have been different." *Taylor*, 107 N.M. at 73, 752 P.2d at 788. In regards to the hair identification evidence, Defendant's trial counsel was able to discredit the State's hair identification evidence by eliciting on cross-examination of the State's expert witnesses that hair analysis could not conclusively establish identity. Defendant does not explain how a hair analysis expert would be able to cast further doubt on this evidence.

Regarding the forensics expert, Defendant claims that a forensics expert could have assisted his defense in three areas: (1) she could have analyzed the blood spatters at the Murray Hotel and cast doubt on Salaiz's testimony; (2) she could have reexamined the State's forensics evidence and somehow linked the murder of Brown to the rape and murder of Sanchez; and (3) she could narrow the time when Brown was killed to a two to three hour period for which Defendant had an alibi. Again, however, Defendant fails to show that any of these contentions would probably change the outcome of the case. As to Defendant's first claim, that analysis of the blood spatters at the Murray Hotel would discredit Salaiz's testimony, defense counsel had already discredited Salaiz's testimony by calling several witnesses who described him as a liar. In spite of this testimony, the jury chose to believe him regarding Defendant's "confession" to Brown's murder and to not believe him regarding the aggravated assault.

Defendant's second contention is that a re-examination of the State's forensics evidence could exonerate Defendant by showing that whoever had killed Brown had also killed Sanchez. Defendant wanted his forensics expert to examine the blood in Brown's apartment and slides taken from Brown. The blood in Brown's apartment had not been tested to see if it came from the victim or the perpetrator and, consequently, did not implicate Defendant in Brown's murder. During his closing argu-

18

ment, defense counsel was able to capitalize on the State's failure to perform this blood analysis. The slides indicated that Brown had not been raped and in no way implicated Defendant in her murder. Defendant has failed to show that a re-examination of these slides could establish a link between Brown's murder and Sanchez's murder. Moreover, establishing a link would be helpful to the defense only if Defendant could show that he was not the perpetrator of Sanchez's murder. However, this avenue was eliminated because the State had compared samples from Defendant to samples from the Sanchez case. The record is not clear as to whether these DNA samples identified Defendant as Sanchez's rapist or whether the results were too inconclusive to eliminate Defendant as a suspect. In addition, Defendant has not shown that a fingerprint analysis could have linked any other suspect with Brown's murder.

Defendant's third contention is that his forensics expert could narrow the time of Brown's death to a two to three hour period for which Defendant had an alibi. On appeal, however, Defendant does not show that his forensics expert could have narrowed the time of death to such a period of time. In addition, Defendant presented alibi testimony at trial. We cannot say that but for counsel's failure to employ a forensics expert the result of Defendant's trial would have been different.

■ Defendant's other contentions regarding ineffective assistance of counsel are related and will be considered together. Defendant asserts that his trial counsel was inexperienced and unprepared for trial, that defense counsel and the Public Defender's Office failed to provide co-counsel knowledgeable about scientific evidence, and that defense counsel had not adequately investigated the case. Our review of the record, however, indicates that Defendant was adequately represented. Trial counsel adequately cross-examined the State's witnesses, including its expert witnesses, and offered witnesses to attack the credibility of Salaiz. Moreover, we do not inquire as to how many attorneys are employed to represent a criminal defendant but rather examine whether he was adequately represented. *Chamberlain*, 112 N.M. at 733–34, 819 P.2d at 683–84. While trial counsel failed to locate two witnesses that Defendant argues were critical to establish his alibi defense, Defendant has failed to demonstrate that the potential witnesses were willing to testify and would have given favorable evidence. *United States v. Rodgers*, 755 F.2d 533, 541 (7th Cir.), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985); *Brazeal*, 109 N.M. at 758, 790 P.2d at 1039. Furthermore, counsel introduced other alibi witness testimony. Our review of the record satisfies us that Defendant was not denied effective assistance of counsel.

III

■ The next issue that we address is whether the trial court erred when it allowed Detective Bruce to testify after he remained in the courtroom during other witnesses' testimony at the preliminary hearing and then again at trial. At trial, Defendant moved to exclude Bruce's testimony. Citing SCRA 1986, 11–615; *State v. Hovey*, 106 N.M. 300, 304, 742 P.2d 512, 516 (1987); and *State v. Reynolds*, 111 N.M. 263, 268–70, 804 P.2d 1082, 1087–89 (Ct.App.1990), *cert. denied*, 111 N.M. 164, 803 P.2d 253 (1991), Defendant contends that, by allowing Bruce to hear the testimony of other witnesses, his testimony was tainted and that the trial court abused its discretion by failing to exclude Bruce's testimony. We disagree.

■ Under SCRA 1986, 11–615, a party may request that the trial judge exclude witnesses from the courtroom while other witnesses are testifying. However, the rule does not allow the trial judge to exclude "a person whose presence is shown by a party to be essential to the presentation of his cause." *Id.* The trial court has broad discretion in the application of Rule 11–615. *Hovey*, 106 N.M. at 304, 742 P.2d at 516. We will not disturb the decision of the trial court absent a clear abuse of this discretion and prejudice to the complaining party. *State ex rel. State Hwy. Dep't v.*

*First National Bank in Albuquerque,* 91 N.M. 240, 242, 572 P.2d 1248, 1250 (1977).

In the instant case, we find neither an abuse of discretion nor prejudice to Defendant. Bruce was the police officer charged with investigating this murder case. As part of his duties as the investigating officer, Bruce had on prior occasions interviewed all of the witnesses and already knew what they would say. If hearing the testimony of the other witnesses caused Bruce to change his testimony at trial, defense counsel could impeach that testimony with Bruce's investigative reports and testimony from the pre-trial hearing. In addition, as the investigating officer, Bruce remained at counsel table to assist the State in presenting its case. While exclusion of similar testimony may be appropriate under different circumstances, under the facts of this case the trial court did not abuse its discretion.

## IV

The next issue that we address is whether the trial court erred when it admitted various photographs and a videotape of the victim's apartment. Prior to trial, Defendant moved to exclude the videotape and photographs contending that the probative value of this evidence was outweighed by its prejudicial effect. *See* SCRA 1986, 11–403. Defendant argues that the photographs and videotape showed "numerous images of the body of the victim" that made this evidence prejudicial and inflammatory. In addition, Defendant argues that the evidence was not relevant because the condition and position of the body as well as the fact that the victim's death was not accidental were not at issue in the case. *See* SCRA 1986, 11–402 (irrelevant evidence is inadmissible). Defendant concludes that the trial court abused its discretion by failing to exclude this evidence.

The trial court may, in its discretion, exclude relevant evidence, such as photographs and videotapes, if the evidence is "calculated to arouse the prejudices and

passions of the jury and [is] not reasonably relevant to the issues of the case." *State v. Boeglin,* 105 N.M. 247, 253, 731 P.2d 943, 949 (1987). We will not disturb the trial court's decision in the absence of an abuse of discretion. *Id.* (upholding admission of photograph of victim's wound even though fact that defendant had inflicted wound not at issue).

We have viewed the videotape and studied the photographs and cannot say that the trial court abused its discretion in admitting either into evidence. Most of the photographs and a majority of the videotape show the exterior and interior of Brown's apartment. Of the nine photographs admitted into evidence, only one gives a view of the victim's body. In the approximately twenty minute videotape that the jury viewed, the victim's body was in view for approximately one minute. Defendant objected to any view of the victim's body because "[t]he condition and position of the body were not issues, nor was the fact that death was not accidental." We disagree. Defendant was charged with first degree willful and deliberate murder, NMSA 1978, Section 30–2–1(A)(1) (Repl. Pamp.1984), thereby making intent to kill an issue in the case.[3] Pictures of the condition and position of the body as well as the disarray in the bedroom and blood on the bed would allow the jury to draw the inference that a struggle had ensued prior to the victim's death and, thus, are relevant to show that Defendant had the requisite intent to kill. Moreover, Defendant was charged with felony murder, Section 30–2–1(A)(2), aggravated burglary, NMSA 1978, Section 30–16–2 (Repl.Pamp.1984), attempted robbery, NMSA 1978, Section 30–28–1 (Repl.Pamp.1984), and battery, NMSA 1978, Section 30–3–4 (Repl.Pamp.1984). Pictures of the possible places of entry into the apartment, the overturned purse and its contents, and the victim's bruised and bloodied face are relevant to these charges. Thus, the photographs and videotape were highly relevant to the charges against De-

**3.** In addition, our recent decision in *State v. Ortega,* 112 N.M. 554, 817 P.2d 1196 (1991), makes intent to kill an issue in felony murder. *See* Section VI–E, *infra.*

fendant. *See Boeglin,* 105 N.M. at 253, 731 P.2d at 949.

Moreover, we do not believe that Defendant suffered any undue prejudice by the admission of the photographs and videotape. The trial court minimized possible prejudice to Defendant by ordering the State to edit the videotape prior to trial and exercising control over the presentation of the tape at trial. *See id.* In addition, the State was not allowed to admit all of the available still photographs at trial. Further, the photographs and videotape were not "calculated to arouse the prejudices and passions of the jury." *State v. Bell,* 90 N.M. 134, 139, 560 P.2d 925, 930 (1977). Because the probative value of this evidence outweighed the possible prejudice to Defendant, we find no abuse of discretion.

V

■ The next issue that we address is whether the trial court erred when it denied Defendant's motion for recusal. Early on in this case, the judge offered to recuse himself because his mother was a friend of the victim. At that time, Defendant declined the judge's offer. After the judge denied Defendant's motion for a continuance, in part because the judge stated that such a continuance would be unfair to the victims, Defendant moved to recuse the judge. Citing SCRA 1986, 5–106(E) (Repl.Pamp.1992), Defendant now argues that the trial judge erred by failing to recuse himself because, under the facts of this case, his impartiality could be called into question.

■ While we agree with Defendant that a district judge should voluntarily enter a recusal in any case where his or her impartiality could reasonably be questioned, SCRA 1986, 5–106(E), such recusal is within the sound discretion of the trial judge. *State v. Fero,* 105 N.M. 339, 343, 732 P.2d 866, 870 (1987). Voluntary recusal is reserved for compelling constitutional, statutory, or ethical reasons because "[a] judge 'has a duty to *sit* where *not disqualified* which is equally as strong as the duty to *not sit* where *disqualified.*'" *Gerety v. Demers,* 92 N.M. 396, 400, 589 P.2d 180, 184 (1978) (quoting *Laird v. Tatum,* 409 U.S. 824, 837, 93 S.Ct. 7, 14, 34 L.Ed.2d 50 (1972) (Rehnquist, J., mem.)).

■ Defendant contends that, because the judge's mother was a friend of the victim, the judge was biased against him and the judge's impartiality could be questioned. He concludes that the judge abused his discretion by failing to recuse himself. We disagree. In order to require recusal, bias must be of a personal nature against the party seeking recusal. *State v. Case,* 100 N.M. 714, 717, 676 P.2d 241, 244 (1984). Personal bias cannot be inferred from an adverse ruling or the enforcement of the rules of criminal procedure. *See id.* In the instant case, the judge had previously informed the parties of his mother's friendship with the victim. Because Defendant did not think that recusal of the trial judge was necessary until after an adverse ruling, we hold that the trial judge did not abuse his discretion by declining to recuse himself.

VI

Defendant raises several issues relating to jury selection, function, and instruction including: (1) Whether the trial court erred when it refused to order the sheriff to bring a potential juror to court for jury duty; (2) whether the trial court erred when it denied Defendant's motion for a change of venue; (3) whether the trial court erred when it denied Defendant's challenges for cause of various potential jurors; (4) whether the trial court erred when it informed the jury that the State would not seek the death penalty; and (5) whether the trial court erred when it gave the felony murder instruction to the jury. We discuss each issue separately.

A

■ Defendant first contends that the trial court erred when it failed to delay voir dire (and ultimately trial) and send the sheriff to bring an absent prospective juror to the courtroom. Citing NMSA 1978, Section 38–5–2 (Repl.Pamph.1987), Defendant claims that the trial court abused its discre-

tion by excusing the potential juror based on an alleged emotional disorder, without taking evidence on that matter.

We need not address whether the trial court abused its discretion in excusing the absent juror because Defendant has failed to demonstrate, nor do we discern, any resulting prejudice.[4] The absent potential juror was the 58th prospective juror chosen and jury selection ended at number 38. Thus, we find no error.

### B

Defendant also contends that the trial court erred when it denied his motion to change venue. Defendant asserts that pervasive pretrial publicity made a change of venue necessary to ensure a fair trial. *See Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963) (due process violated by denial of motion for change of venue after recorded confession broadcast three times). As Defendant concedes, granting or denying a motion for a change of venue is within the sound discretion of the trial court. *State v. Hargrove*, 108 N.M. 233, 239, 771 P.2d 166, 172 (1989). On appeal, the trial court's ruling will not be disturbed absent an abuse of this discretion, and the burden of establishing an abuse of discretion rests with the moving party. *Id.* Potential jurors' exposure to pretrial publicity, by itself, does not require a change of venue and does not raise a presumption of prejudice. *Chamberlain*, 112 N.M. at 726, 819 P.2d at 676. "[T]he pertinent inquiry is whether 'the jurors * * * had such fixed opinions that they could not judge impartially the guilt of the defendant.'" *State v. McGuire*, 110 N.M. 304, 311, 795 P.2d

996, 1003 (1990) (citations omitted) (alterations in original) *quoted in Chamberlain*, 112 N.M. at 726, 819 P.2d at 676.

Citing *State v. Shawan*, 77 N.M. 354, 423 P.2d 39 (1967), Defendant claims that he was prejudiced by pretrial publicity. However, *Shawan* is distinguishable. The defendant in *Shawan* was tried for a second time for assault with the intent to kill after his first conviction was reversed. Prior to jury selection, the defendant moved for a change of venue and filed an affidavit alleging that a front page newspaper story printed the day before the second trial was to start would deny him a fair trial because of public excitement and local prejudice. The story contained an account of the evidence to be introduced at trial, the defendant's prior criminal record, and the fact that the defendant had been travelling in a stolen car prior to the assault. The defendant introduced a copy of the story as an exhibit and offered to call witnesses to testify that the story had also been broadcast on the local radio on the day before trial. After voir dire indicated that a number of jurors had either read the newspaper story or heard the radio broadcast, the defendant renewed his motion, which was denied, and, after being tried and convicted, the defendant appealed. Because the release of the story on the eve of trial had created "an atmosphere incompatible with impartiality," we held that the trial court abused its discretion. *Id.* at 358, 423 P.2d at 42.

Unlike the defendant in *Shawan*, Defendant in the instant case did not introduce evidence that he was deprived of a fair and impartial jury. Unlike the record in *Shawan*, the record before us in this case does not contain any example of pre-trial publici-

---

**4.** Defendant has cited no authority for the proposition that a trial court's failure to bring all potential venire persons to the court prior to jury selection amounts to an abuse of discretion. We have found no authority to support defendant's position; in fact, our research indicates that

In the absence of statute, jurors who do not answer to their names do not need to be sent for, and it is not the practice to issue attachments for missing persons on the jury list when there are enough in attendance to complete the jury.

* * * [A]n accused has no vested right to any particular juror or jurors; all that he can insist on is an impartial jury of the requisite number in his own case and, at the most, a substantial compliance with the statutes governing the selecting and summoning of jurors. 47 Am.Jur.2d *Jury* §§ 191–192 (1969) (footnotes omitted). In the instant case, Defendant asserts neither that there were insufficient venire persons to complete the jury nor that the trial court failed to comply with the statutes governing selecting and summoning jurors.

ty that could have prejudiced the jurors. In fact, Defendant in the instant case failed to file an affidavit alleging that the venire members had been exposed to pre-trial publicity or that pre-trial publicity created an atmosphere of impartiality. Our review of the record on appeal shows that, while many of the prospective jurors had read or heard about the case, all but a few could not remember what they had heard or read. Defendant was able to question these jurors and was able to challenge those who indicated partiality. We hold that Defendant has failed to meet his burden of proving that the trial court abused its discretion by failing to grant a motion for a change of venue.

### C

A related issue that Defendant raises on this appeal is whether the trial court erred when it denied his challenges for cause of various potential jurors. Defendant's challenges can be classified in three categories: (1) prospective jurors who had read or heard about the case, *see State v. Pace,* 80 N.M. 364, 456 P.2d 197 (1969); (2) prospective jurors who knew the victim, *see State v. Dobbs,* 100 N.M. 60, 665 P.2d 1151 (Ct.App.), *cert. quashed,* 100 N.M. 53, 665 P.2d 809 (1983); and (3) a prospective juror who could not serve on a jury for an extended period of time. Defendant concludes that he was denied a fair and impartial jury by failure of the trial court to excuse various jurors for cause.

Whether a prospective juror should be excused for cause rests within the sound discretion of the trial court. *State v. Sutphin,* 107 N.M. 126, 129, 753 P.2d 1314, 1317 (1988). Because the trial judge is in the best position to assess the demeanor and credibility of prospective jurors, we will not disturb his ruling absent a manifest error or a clear abuse of that discretion. *State v. Wiberg,* 107 N.M. 152, 156, 754 P.2d 529, 533 (Ct.App.), *cert. denied,* 107 N.M. 106, 753 P.2d 352 (1988). The burden of establishing an abuse of discretion rests on the moving party. *Id.* at 156–57, 754 P.2d at 533–34. We have reviewed the tapes of the voir dire of those jurors

challenged for cause by the Defendant that he now claims mandate reversal. In each case, the prospective juror stated that he or she could render a fair and impartial verdict. The trial court did not abuse its discretion in denying these challenges for cause.

### D

Defendant also argues that the trial court erred when it informed the jury that the State would not seek the death penalty. By so arguing, Defendant overlooks established New Mexico precedent and a comment to the Uniform Jury Instructions to the contrary. *State v. Martin,* 101 N.M. 595, 605, 686 P.2d 937, 947 (1984) (proper for judge to instruct jury in capital case that the State would not seek death penalty); SCRA 1986, 14–6007 Comment 1 (same). The trial court did not err in informing the jury that the State would not seek the death penalty in this case.

### E

Defendant also contends that the trial court erred when it gave the felony murder instruction to the jury. Citing our recent opinion in *State v. Ortega,* 112 N.M. 554, 817 P.2d 1196 (1991), Defendant claims that the felony murder jury instruction given at his trial, which was identical in form to that given in *Ortega,* failed to include an essential element of the crime: the intent to kill. At trial, Defendant objected to the felony murder instruction, arguing that the evidence introduced did not support instructing the jury on this count; however, he did not object to the lack of the intent to kill element in the instruction. As Defendant recognizes, his failure to object to the lack of intent in the instruction may be raised as a basis for appeal only if it constitutes fundamental error. *Id.* at 566, 817 P.2d at 1208. Under the analysis set forth in *Ortega,* Defendant concludes that the trial court committed fundamental error because he lacked the intent to kill: if the jury believed the testimony of David Salaiz, he (Defendant) cannot be convicted of felony murder because the killing was accidental.

In *Ortega*, the defendant, Richard Ortega, was charged with murder in connection with the stabbing deaths of two victims. At the close of evidence, the trial court instructed the jury to consider three different murder theories: willful and deliberate murder under NMSA 1978, Section 30–2–1(A)(1), and SCRA 1986, 14–201; felony murder under Section 30–2–1(A)(2), and SCRA 1986, 14–202; and second degree murder under Section 30–2–1(B) and SCRA 1986, 14–211. *Ortega*, 112 N.M. at 564–65, 567, 817 P.2d at 1206–07, 1209. After the jury found him guilty of felony murder, Ortega appealed, claiming that the felony murder statute and the instructions proffered by the trial court unconstitutionally established a presumption of mens rea or, in the alternative, that the felony murder statute unconstitutionally created a strict liability crime. While we did not find that our felony murder statute was unconstitutional, *see Ortega*, 112 N.M. at 575–76, 817 P.2d at 1217–18 (BACA, J., dissenting in part), we interpreted the statute to contain an element of intent to kill in addition to the intent to commit the underlying felony. *Id.* at 563, 817 P.2d at 1205 (majority opinion). We defined that intent to kill as follows:

> The intent to kill need not be a "willful, deliberate and premeditated" intent as contemplated by the definition of first degree murder in Subsection 30–2–1(A)(1), nor need the act be "greatly dangerous to the lives of others, indicating a depraved mind regardless of human life," as contemplated by the definition in Subsection (A)(3). Indeed, an intent to kill in the form of knowledge that the defendant's acts "create a strong probability of death or great bodily harm" to the victim or another, so that the killing would be only second degree murder under Section 30–2–1(B) if no felony were involved, is sufficient to constitute murder in the first degree when a felony *is* involved—or so the legislature has determined. Second degree murder, in other words, may be elevated to first degree murder when it occurs in circumstances that the legislature has determined are

so serious as to merit increased punishment * * *.

*Ortega*, 112 N.M. at 563, 817 P.2d at 1205.

As in *Ortega*, the jury in the instant case was instructed on willful and deliberate murder, felony murder, and second degree murder regarding the death of Brown. The jury in the instant case, like the jury in *Ortega*, found Defendant not guilty on the willful and deliberate murder charge but guilty of felony murder. The verdict of not guilty to the charge of willful and deliberate murder in the instant case is consistent with evidence presented at trial. The State's expert witness testified that the cause of Brown's death was suffocation. The victim had numerous bruises on her body and other external injuries to her face. The disarray of the apartment and the unnatural position of the victim's body indicated that the victim may have been involved in a struggle prior to her death. Salaiz testified that Defendant told Salaiz that he (Defendant) had panicked during the burglary and placed a pillow over the victim's head to quiet her screams. Salaiz also testified that Defendant had said "I killed the old lady. I didn't mean to." While this evidence may have been sufficient to support a conviction for willful and deliberate murder, the jury could have concluded that Defendant, like the defendant in *Ortega*, had not given careful thought to his proposed course of action, had not weighed considerations for and against that course of action, and had not considered the reasons for or against such action. *See Ortega*, 112 N.M. at 567, 817 P.2d at 1209; SCRA 1986, 14–201.

The above evidence is also consistent with a conviction for felony murder. Defendant seizes on his statement, as testified to by Salaiz, "I didn't mean to [kill Brown]," and our statement in *Ortega* "[a]n unintentional or accidental killing will not suffice [to support a conviction for felony murder]," 112 N.M. at 563, 817 P.2d at 1205, to argue that he did not have sufficient intent to kill. We disagree. As we stated in *Ortega*, "intent to kill in the form of knowledge that the defendant's acts 'create a strong probability of death or great bodily harm' to the victim or another,

so that the killing would be only second degree murder under Section 30–2–1(B) if no felony were involved, is sufficient to constitute murder in the first degree when a felony *is* involved." *Id.* In the instant case, as in *Ortega*, the jury must have concluded that, during the course of the predicate felonies, Defendant caused the victim's death and could have concluded that he knew that his actions of holding a pillow over the victim's face for several minutes created a strong probability of death or great bodily harm. *See Ortega*, 112 N.M. at 566–69, 817 P.2d at 1208–11. Thus, the jury would have been justified in rendering a guilty verdict on the charge of second degree murder. "Second degree murder * * * may be elevated to first degree murder when it occurs [during the commission of a dangerous felony] * * *." *Id.* at 563, 817 P.2d at 1205.

"The doctrine of fundamental error * * * will be invoked by an appellate court only when the question of guilt is so doubtful that it would shock the conscience to permit the verdict to stand, or when the court considers it necessary to avoid a miscarriage of justice." *Id.* at 566, 817 P.2d at 1208. In the instant case, as in *Ortega*, "we not only have confidence in the jury's verdict * * *; we think it would be a miscarriage of justice to upset the verdict[ ] and remand for a new trial, the outcome of which most assuredly would be the same." *Id.* at 566–67, 817 P.2d at 1208–09.

### VII

The next issue raised by Defendant is whether the trial court erred when it qualified Arnold Bentz as an expert witness for the State. At trial, the State offered Bentz as an expert on hair analysis based on his job training and experience. Defendant objected, claiming that this experience was insufficient to qualify Bentz as an expert. The trial court qualified Bentz as an expert, and he testified as to his role in the investigation, which was to separate hairs collected from the crime scene into those matching the victim's hair and those not matching the victim's hairs. Defendant now claims that Bentz lacked

the scientific education and training necessary to qualify him as an expert witness.

Under SCRA 1986, 11–702, a trial court must make a two-prong inquiry before allowing expert testimony to be introduced. First, the trial court must determine whether scientific, technical, or other specialized knowledge will assist the jury in its understanding or in determining a fact at issue. *Id.* Second, the trial court must determine whether the proffered expert witness is qualified based on his or her "knowledge, skill, experience, training, or education." *Id.* We review the determination of the trial court that Bentz was qualified to give expert testimony for an abuse of discretion. *See Madrid v. University of California*, 105 N.M. 715, 717, 737 P.2d 74, 76 (1987); *State v. Newman*, 109 N.M. 263, 265, 784 P.2d 1006, 1008 (Ct.App.), *cert. denied*, 109 N.M. 262, 784 P.2d 1005 (1989).

Defendant asserts that, because Bentz lacked a scientific education and training, he was not properly qualified as an expert witness, and that the trial court abused its discretion in allowing him to testify. As we noted in *Madrid*, however, the use of the disjunctive "or" in the rule "indisputably recognizes that an expert witness may be qualified" on the basis of any one of the five factors. 105 N.M. at 717, 737 P.2d at 76. The evidence introduced at trial demonstrated that Bentz had in excess of sixteen years of job experience performing trace evidence analysis, including hair analysis. Based on this evidence, the trial court did not abuse its discretion in qualifying Bentz as an expert witness. Any perceived deficiency in Bentz's education and training is relevant to the weight accorded by the jury to his testimony and not to the testimony's admissibility.

### VIII

The next issue raised by Defendant is whether the trial court erred when it denied his motion in limine or motion for a continuance based on a prosecutorial misconduct. In June of 1990, Defendant requested that the State turn over certain slides in its possession to Dr. Griest. Griest was told by the State's agent, Captain

Hall, that the slides either did not exist or were lost. Griest finally received the slides approximately one week prior to trial, and Defendant moved for a continuance, contending that the delayed delivery of the evidence in the State's possession was too late for Griest to prepare for trial. When the trial court denied the motion for a continuance, Defendant made a motion in limine to prohibit the State's expert from testifying about the slides. This motion was also denied. Citing *State v. Wisniewski*, 103 N.M. 430, 708 P.2d 1031 (1985), and SCRA 1986, 5-501 (Repl.Pamp.1992), Defendant claims that an agent's misconduct in misplacing evidence should be imputed to the District Attorney. Defendant cites SCRA 1986, 5-505(B) (Repl.Pamp.1992), for the proposition that the trial court should have granted his motion in limine to preclude the State's expert from testifying regarding the evidence or granted a continuance to allow his expert to prepare for trial.

The State has a duty to disclose the results of scientific tests or experiments that are within the control or possession of the State and that are known or with reasonable diligence should be known to the prosecutor. Rule 5-501(A)(4). Information within the custody or control of an agent of the State is presumed to be within the control of the prosecutor. *See Wisniewski*, 103 N.M. at 435, 708 P.2d at 1036 (extending prosecutor's duty to disclose exculpatory information to police who are part of prosecutorial team). When the State fails to deliver such evidence to the defendant, the trial court may, in its discretion, resort to several sanctions, including limiting the admissibility of the evidence or granting a motion for a continuance. Rules 5-501(G) & 5-505(B). On review, however, the defendant bears the burden of showing that he was prejudiced by the nondisclosure. *See State v. Griffin*, 108 N.M. 55, 58, 766 P.2d 315, 318 (Ct.App.) (interpreting Rule 5-501(A)(5)), *cert. denied*, 108 N.M. 97, 766 P.2d 1331 (1988).

In the instant case, Defendant has failed to meet his burden of showing prejudice. The evidence in question, the slides taken from the victim, showed that she was not raped prior to her death. Nothing contained in the slides implicated Defendant in her murder. Thus, we find no prejudice here. The trial court did not err in refusing to grant Defendant's motion for a continuance nor his motion in limine.

## IX

Defendant next contends that the trial court erred when it failed to rule on the sufficiency of the evidence prior to submitting the case to the jury. At the close of the State's case, Defendant moved for a directed verdict based on insufficient evidence, and the trial court denied the motion. Defendant then presented his case, and, after the trial court submitted the case to the jury, Defendant moved for a mistrial because the trial court had failed to again rule on the sufficiency of the evidence. Citing SCRA 1986, 5-607(K) (Repl.Pamp.1992), and *State v. Lard*, 86 N.M. 71, 519 P.2d 307 (Ct.App.1974), Defendant claims that the trial court erred by failing to consider the sufficiency of the evidence before presentation of the case to the jury, even though he did not renew his directed verdict motion.

We agree with Defendant that the trial court must rule on the sufficiency of the evidence before presenting the case to the jury. SCRA 1986, 5-607(K) ("[at the close of all evidence, the trial] court shall determine the sufficiency of the evidence, whether or not a motion for directed verdict is made"). We do not agree, as Defendant suggests, that this procedural lapse by the trial court merits reversal. As the Court of Appeals has held, we hold that the failure of the trial court to rule on the sufficiency of the evidence before presentation of the case to the jury merely preserves the issue of sufficiency of the evidence for appellate review. *See Lard*, 86 N.M. at 73, 519 P.2d at 309.

## X

The above discussion necessarily suggests the next issue that we address: Whether there was sufficient evidence introduced at trial to support Defendant's

conviction. Defendant asserts that the only evidence linking him to Brown's murder and the burglary, attempted robbery, and battery was the testimony of David Salaiz and hair samples collected at the scene. Defendant argues that the State's expert testimony indicated that the hair samples found in Brown's apartment, while matching Defendant's hair, could also have come from another person. In addition, Defendant asserts that testimony indicated that Salaiz had the reputation of being a liar, that Salaiz had incentives to lie, *i.e.*, reward money and favorable treatment on pending criminal matters, and that the jury did not believe Salaiz's testimony as illustrated by its not guilty verdict on the aggravated battery charge against defendant.[5] Defendant concludes that his conviction was not supported by substantial evidence.

Our review consists of determining "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *Sutphin*, 107 N.M. at 131, 753 P.2d at 1319. "Substantial evidence is that evidence which is acceptable to a reasonable mind as adequate support for a conclusion." *State v. Isiah*, 109 N.M. 21, 30, 781 P.2d 293, 302 (1989). We view the evidence in the light most favorable to supporting the verdict and resolve all conflicts and indulge all inferences in favor of upholding the verdict. *Sutphin*, 107 N.M. at 131, 753 P.2d at 1319. We may not reweigh the evidence nor substitute our judgment for that of the jury. *Id.*

In light of the above standard of review, Defendant's contention of insufficient evidence to support his guilty verdicts must fail. The evidence adduced at trial favorable to supporting the verdicts is as follows. Salaiz testified that Defendant told him (Salaiz) that he (Defendant) had entered the victim's apartment to steal something to sell to obtain money to purchase drugs. Salaiz also testified that Defendant

related that, while in the apartment, he encountered the victim who started to scream, he panicked, and then he killed the victim. The State also introduced expert testimony that hairs found at the murder scene matched known hair samples of Defendant. While Defendant attacked Salaiz's credibility and the validity of the hair identification, our duty on appeal is neither to substitute our judgment for that of the jury nor reweigh the evidence. As indicated by the verdicts, the jury believed Salaiz's testimony regarding the murder and burglary and could have found that the hair analysis, while not conclusive in establishing Defendant's identity as the murderer, linked Defendant to the murder. Thus, as the above discussion indicates, substantial evidence supports Defendant's conviction.

## XI

Defendant's final argument is that the above claims of error, taken cumulatively, amount to a violation of his right to due process. The doctrine of cumulative error "requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *Martin*, 101 N.M. at 601, 686 P.2d at 943. In the instant case, the only error committed by the trial court was its failure to anticipate our opinion in *Ortega*, which changed the law regarding felony murder. Our review of the record indicates that Defendant received a fair trial; therefore, we do not find cumulative error.

In accordance with the foregoing discussion, the decision of the trial court is AFFIRMED.

IT IS SO ORDERED.

RANSOM, C.J., and MONTGOMERY, J., concur.

---

**5.** Defendant also contends that even if the jury believed Salaiz's testimony regarding Defendant's involvement in the burglary at Brown's apartment, this testimony does not establish that Defendant had the intent to kill Brown as required by *Ortega*. We have already discussed this issue in Section VI–E, *supra*, and see no reason to repeat that discussion here.