742 P.2d 512 (1987)
106 N.M. 512
STATE of New Mexico, Plaintiff-Appellee,
v.
John HOVEY, Defendant-Appellant.
No. 16576.
Supreme Court of New Mexico.
September 2, 1987.
*513 Hal Stratton, Atty. Gen., William McEuen, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.
Jacquelyn Robins, Chief Public Defender, Bruce Rogoff, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

OPINION
WALTERS, Justice.
Defendant John Hovey was sixteen years old at the time his parents were shot and *514 killed in their home on June 19, 1984. The father died immediately, but defendant's mother lived for several hours after the shooting. When police and medical teams arrived on the scene, she told them her son had shot her. Defendant presented an alibi defense, and his sister Karen testified she saw a dark shadowy figure, much bigger than John, in the parents' bedroom pointing a gun. Defendant was convicted on two counts of first degree murder and was sentenced to two consecutive life terms. He raises nine issues on appeal. We affirm.
The initial challenge concerns defendant's having been originally charged in children's court, and thence transferred to district court to be tried as an adult. Notice of appeal of the transfer was filed on August 13, 1984 at 9:13 a.m., a week after the order of transfer. On that same afternoon, the grand jury returned an indictment against defendant. Defendant disputes the grand jury's power to indict him during the pendency of his appeal of the transfer order.
Defendant failed to seek a stay at the time his notice of appeal was filed, as required by NMSA 1978, § 32-1-39(B) (Repl.Pamp. 1984). The statute reads: "The appeal to the court of appeals does not stay the judgment appealed from, but the court of appeals may order a stay upon application and hearing consistent with the provisions of the Children's Code if suitable provision is made for the care and custody of the child." We do not agree with defendant's argument that a transfer order is not such a "judgment" as to which the statute would apply. A transfer order is appealable, In re Doe II, 86 N.M. 37, 519 P.2d 133 (Ct.App. 1974), and therefore obviously operates as a judgment for purposes of invoking the right to appeal authorized by NMSA 1978, § 32-1-39(A) (Repl.Pamp. 1984). The statute's two subsections must be interpreted consistently, as the legislature would not intend to give the word "judgment" two different meanings under the same section. See In re Ranchers-Tufco Limestone Project Joint Venture v. Revenue Division, N.M. Taxation and Revenue Dept., 100 N.M. 632, 637, 674 P.2d 522, 527 (Ct.App.), cert. denied, 100 N.M. 505, 672 P.2d 1136 (1983). Recognizing that the practice of seeking an indictment on the same day an appeal is filed certainly is not the most fiscally conservative conduct on the part of the State, nevertheless there is a clear mechanism by which defendant may obtain a stay. The court of appeals, to which a transfer appeal would be taken, has made it eminently clear that it will routinely grant stays, upon application, when transfers from children's court to district court are appealed. State v. Greg R., 104 N.M. 778, 727 P.2d 86 (Ct. App. 1986). Having failed to request a stay, defendant waived any impediment to the State's obtaining a grand jury indictment of defendant for trial in district court.
As a second issue, defendant attacks the grant of permission to televise defendant in the courtroom while he was testifying. He relies heavily on Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), where it was held that the use of television cameras denied the defendant a fair trial, requiring reversal of the conviction there obtained. Estes, however, has been limited by the more recent case of Chandler v. Florida, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1984), which held that the filming of a trial is not per se unconstitutional.
The Supreme Court rule grants to trial judges the discretion to limit or deny television coverage for good cause. SCRA 1986, 23-107. Although filming of defendant was not at issue, the discretionary standard was articulated in State ex rel. N.M. Press Ass'n v. Kaufman, 98 N.M. 261, 648 P.2d 300 (1982):
"[T]he trial judge [before excluding media coverage of a particular participant in a trial] should require evidence sufficient to support a finding that such coverage will have a substantial effect upon [the] particular individual which would be qualitatively different *515 from the effect on the members of the public in general and that such effect will be qualitatively different from coverage by other types of media."
Id. at 265, 648 P.2d at 301.
Defendant alleged in a pre-trial motion, unsupported by any affidavits, that because the television cameras made him nervous, his credibility would be damaged when he testified. In a trial such as this, credibility and courtroom demeanor of the defendant are crucial. The tendency of television cameras in the courtroom to make a defendant nervous or rattled is certainly a likely effect to be considered. Modification of the Supreme Court Rules may be necessary to emphasize that danger of intimidation and attendant unfairness should be fully recognized when opposed requests for television coverage are decided. In this case, however, defendant failed to present any evidence in support of his assertion that televising portions of the proceedings would prejudice the presentation of his testimony. He is overruled on this challenge.
Defendant's third point is that the trial court abused its discretion in limiting the number of entries from the defendant's diaries which could be read to the jury and explained by the defendant. We affirm the trial court's ruling. There were over 1600 entries in the diaries of defendant; all of the diaries were admitted into evidence and available to the jury. Whether specific entries were read and explained or not, and contrary to defendant's claimed error on appeal, defendant was not deprived of the opportunity to present his defense, and he was able to argue that the diary entries, taken in context, showed normal teenage behavior. SCRA 1986, 11-611 extends broad discretionary authority to the trial court to control the interrogation of a witness for the purpose, among other things, of avoiding the needless consumption of time. See State v. Smith, 92 N.M. 533, 539, 591 P.2d 664, 670 (1979).
Defendant next argues that extensive and sensational pre-trial media coverage of this case warranted a change of venue. Request for change of venue is also directed to the discretion of the trial court, State v. Sierra, 90 N.M. 680, 682, 568 P.2d 206, 208 (Ct.App.), cert. denied, 91 N.M. 4, 569 P.2d 414 (1977), and the court's ruling will not be disturbed unless discretion was abused. Id. Considerable documentary evidence was produced to show broad coverage of defendant's arrest and the circumstances of the murders, but almost all of the publications were made two years prior to trial. See Deats v. State, 80 N.M. 77, 451 P.2d 981 (1969), regarding lack of prejudice when publicity is remote in time.
A careful voir dire of prospective jurors was conducted by the court and the attorneys over three full days, members of the panels being examined in small groups as well as individually. There was simply no showing of media-induced prejudice to compel a change of venue ruling.
Defendant's fifth challenge goes to an alleged violation by the State of NMSA 1978, Crim.P.R. 27(a)(4) (Repl.Pamp. 1985) (now SCRA 1986, 5-501(A)(4)), and arose because of the comment made during the State's opening argument that primer residue had been found on defendant's hands. Defense counsel objected to the statement as "not true," claiming that the expert's report furnished to him concluded that the test on defendant was "negative." The State explained that the raw test data, according to the expert, showed some residue, though insufficient to establish the results as "positive." Defense counsel claimed he had never been furnished the raw data; that only the test results had been supplied. The trial court ordered that the raw data be supplied at "the earliest opportunity."
Although we have listened to the record at the reference point provided us, we heard no motion for mistrial, so the argument here for mistrial was not preserved below and will not be heard. SCRA 1986, 12-216(A). Nor do we think a mistrial would have been required if the motion had been made. The State had furnished "any results or reports * * * of scientific tests," as required by the rule, and the underlying data was available if it, too, had been requested. The evidence adduced might have *516 been inadmissible because it did not tend to show a fact more or less probable than not (see SCRA 1986, 11-401), but that objection was not made either during opening statements or when the expert testified. We overrule defendant's alleged point of error.
Defendant asserts next that an alleged jury taint required a mistrial,[1] but his argument on that point is so brief that the gist of "taint" must almost be guessed at. When a juror becomes disqualified by reason of his apparent bias during trial, the proper remedy is to excuse and replace that juror with an alternate if the rest of the jury panel has not been tainted. State v. Padilla, 91 N.M. 451, 575 P.2d 960 (Ct.App. 1978). Defendant's only intimation that the entire jury was tainted appears in a statement that the trial court "never asked the other jurors if they were aware of the note." The evidence discloses that when questioned by the court, the juror denied he had shown the note to any other jurors, denied he had discussed his concern with any other jurors, and denied that any other juror had made similar comments to him. In his brief, defendant did not alert us to any portion of the record that would show his request at that time for examination of any other member of the jury. However, we have listened to the tape sections referred to us by the State, and it is clear that the defense was first aware of the note in the morning before the trial resumed. Defendant requested that the juror be replaced, but did not ask the court at that time to allow voir dire of that juror or of the jury panel. The court allowed the trial to continue. Following the noon recess, defendant moved for mistrial, and alternatively asked for examination of the juror and other panel members.
It has been held that a mistrial motion will be considered untimely unless it is made at the earliest opportunity. State v. Olivares, 95 N.M. 222, 620 P.2d 380 (Ct. App. 1980). The untimeliness of the motion that ultimately was made, in addition to the untimeliness of a request for any other corrective action that might have been proper had a timely effort been made to show jury taint, leads us to the conclusion that no claim of error was preserved by defendant on the issue of jury taint.
The trial court's limitation of the testimony of a witness who was inadvertently present in the courtroom during the testimony of another defense witness is the basis of defendant's seventh point. As the trial court noted, the situation that occurred was precisely the evil the rule of exclusion from the courtroom, SCRA 1986, 11-615, was designed to prevent. The witness had heard the cross-examination and rehabilitation of another defense witness, and thus he was presented with the opportunity to tailor his testimony and anticipate the prosecutor's questions on cross-examination. The trial court properly exercised its discretion in limiting the testimony of that witness to defendant's character and reputation. State v. Simonson, 100 N.M. 297, 669 P.2d 1092 (1983).
Defendant urges also that misconduct by the prosecutor requires reversal. He refers to the point during trial when the State objected to a comment by defense counsel during his extensive questioning of defendant about the diaries, and the prosecutor said in front of the jury that it was not the prosecution that was forcing the jury to sit through "hour after hour" of diary testimony. Although in our view, that was fair comment in response to defendant's remark during witness examination, no objection to the prosecutor's comment was made. Consequently, that challenge here is likewise not reviewable. State v. Ruffino, 94 N.M. 500, 502, 612 P.2d 1311, 1313 (1980).
The final issue is whether defendant's privilege against self-incrimination was violated by the use of court-ordered handwriting exemplars. According to State v. Archuleta, 82 N.M. 378, 482 P.2d 242 (Ct.App. 1970), cert. denied, 82 N.M. 377, 482 P.2d 241 (1971), compelled handwriting *517 exemplars are nontestimonial and do not constitute self-incrimination.
We AFFIRM defendant's conviction.
SCARBOROUGH, C.J., and RANSOM, J., concur.
NOTES
[1] A juror, during trial, sent a note to the court: "Like a repititive [sic] T.V. commercial gimmick, the attorney for the defendant says, `Isn't that correct?' at the end of his inquiry. I think he has his thumb on the scale of justice. Isn't that correct?"