# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 9, 2014

Docket No. 33,864

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

NIEVES SONNY ORTEGA,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF LEA COUNTY
Mark Terrence Sanchez, District Judge

Jorge A. Alvarado, Chief Public Defender
Steven James Forsberg, Assistant Appellate Defender
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
Ann M. Harvey, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**VIGIL, Chief Justice.**

{1}    Nieves Sonny Ortega (Defendant) appeals directly to this Court from a life sentence stemming from a conviction of first-degree murder. Defendant was convicted of one count of willful and deliberate murder, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994). Defendant was also convicted of conspiracy to commit first-degree murder, attempted first-degree kidnapping, attempted armed robbery, conspiracy to commit robbery, and conspiracy to commit first-degree kidnapping. On appeal, Defendant presents the following arguments: (1) the record establishes a case of ineffective assistance of counsel, (2) the district court

1

improperly denied an important defense witness use immunity, (3) the testimony of the State's medical expert violated Defendant's confrontation rights, (4) Defendant's multiple conspiracy convictions violate double jeopardy, (5) the jury was improperly instructed, (6) the State violated its duty to disclose, and (7) cumulative error. We affirm Defendant's convictions for first-degree murder, conspiracy to commit first-degree murder, attempted first-degree kidnapping, and attempted armed robbery. We vacate Defendant's convictions for conspiracy to commit robbery and conspiracy to commit first-degree kidnapping on double jeopardy grounds.

**FACTS**

**{2}** On the night of January 29, 2010, Adam Laureles (Laureles) drove to the residence of a friend in Hobbs, New Mexico to pick up his brother, Chris Laureles (Victim.) Victim was listening to music and drinking beer with a small group of people. At around midnight, a member of the group left and returned with Defendant and Mark Ruiz (Co-defendant).

**{3}** Co-defendant threatened Victim over money Victim allegedly owed to him and directed Victim to leave with him. Victim refused. Co-defendant pulled out a handgun, and Defendant placed his hand in his pocket making it appear that he also had a gun. Co-defendant told Victim to take off his jewelry, but Victim refused. Co-defendant wanted the jewelry or Victim's car as collateral for the debt allegedly owed to him. Defendant walked outside the house, and was followed by Laureles, Victim, and Co-defendant.

**{4}** Upon going outside, Laureles noticed a car parked on the street behind Victim's car, which he believed to be Defendant's car. Victim and Co-defendant walked over to Victim's car and Victim asked Co-defendant to get in the car with him. Victim got into the driver's seat while Co-defendant remained standing outside the car, next to the driver's side. Co-defendant reached into Victim's car, grabbed a flashlight, and hit Victim on the head with it. Victim started the car, put it in reverse, and hit the gas. Victim backed into Defendant's car but before he could take off, Defendant and Co-defendant opened fire. Once the shooting stopped, Victim jumped out of the passenger side door, took several steps, collapsed, and died on the scene. The Office of the Medical Investigator (OMI) determined that Victim died from gunshot wounds to the chest, abdomen, and left arm, and ruled the death a homicide.

**DISCUSSION**

**I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING DEFENSE WITNESS CO-DEFENDANT USE IMMUNITY**

**{5}** During its case in chief, defense counsel informed the district court that he intended to call Co-defendant as a witness, but that defense counsel expected him to refuse to testify on Fifth Amendment grounds. In chambers, Co-defendant confirmed that he would assert his constitutional right against self-incrimination if called to testify, but asserted that he would testify if he was granted use immunity. Defense counsel requested that the district

2

court grant Co-defendant use immunity to testify under Rule 5-116 NMRA, arguing that Co-defendant was important to Defendant's defense because he was an eyewitness to the events that had transpired. The State opposed use immunity for Co-defendant, citing its concurrent prosecution of Co-defendant and arguing that if Co-defendant were granted use immunity, his case would have to be conflicted out to another judicial district. After asking defense counsel about the "significant financial resources" that had been devoted to Co-defendant's case and noting that Co-defendant's case was "ripe for trial," the district court denied Defendant's motion to grant use immunity to Co-defendant.

**{6}** Defendant argues that the district court erred in denying his motion to grant Co-defendant use immunity. Defendant argues that the district court failed to conduct a balancing test as required under *State v. Belanger*, 2009-NMSC-025, ¶ 38, 146 N.M. 357, 210 P.3d 783. Defendant also argues that the district court erred because it appeared to make its decision based on the State's concerns about conflicting out Co-defendant's case to another judicial district. According to Defendant, these concerns should not have outweighed his right to present a defense. While we agree with Defendant that the district court's apparent reasoning for denying witness use immunity was not appropriate, we affirm the district court's decision on other grounds.

**{7}** We review a district court's decision to grant witness use immunity for an abuse of discretion. *See id.* ¶ 38. "[W]e will affirm the trial court's decision if it was right for any reason so long as it is not unfair to the appellant." *See State v. Gallegos*, 2007-NMSC-007, ¶ 26, 141 N.M. 185, 152 P.3d 828.

**{8}** Under a grant of use immunity, the State promises to refrain from using a witness's testimony, and any evidence derived from that testimony, in any future prosecution of the witness. *Belanger*, 2009-NMSC-025, ¶ 11; *see also* Rule 11-413 NMRA ("Testimony or evidence compelled under an order of immunity, or any information derived from such testimony or evidence, may not be used against the person compelled to testify or to produce evidence in any criminal case."). In other words, "the prosecution may still proceed with charges against the witness so long as it does not use or rely on the witness's testimony or its fruits." *Belanger*, 2009-NMSC-025, ¶ 11. "The State, if it wishes to prosecute, retains the ability to use other, independently obtained evidence such as material it already had, or material it developed independently of the witness's testimony." *Id.* ¶ 12.

**{9}** Under Rule 5-116(A) NMRA, the defense is permitted to request witness use immunity. In deciding whether to grant a defense witness use immunity over the opposition of the State, the district court must perform a balancing test. The balancing test

> places the initial burden on the accused. The defendant must show that the proffered testimony is admissible, relevant and material to the defense and that without it, his or her ability to fairly present a defense will suffer to a significant degree. If the defendant meets this initial burden, the district court must then balance the defendant's need for the testimony against the

3

government's interest in opposing immunity.

*Belanger*, 2009-NMSC-025, ¶ 38.

**{10}** We hold that the district court did not abuse its discretion in denying Defendant's motion to grant Co-defendant witness use immunity because Defendant failed to meet his burden under *Belanger*. Under *Belanger*, Defendant was required to make a proffer as to what testimony Co-defendant would give. *See id.* (stating that the defendant must demonstrate that "the proffered testimony" is material to his or her defense). Although defense counsel pointed out discrepancies and credibility problems with different prosecution witnesses, he did not make a proffer as to what testimony Co-defendant would give. The district court asked defense counsel if he would like to "address all legs of the test," but he declined, instead deferring to the State's objection. At this point, defense counsel should have made a proffer or could have requested immunity limited to an in camera hearing, which would have allowed the district court to hear Co-defendant's testimony and gauge its importance. *See id.* ¶ 39 (stating that an in camera interview "for the purpose of understanding what the witness's testimony at trial will be" does not bind the district court at trial). Defense counsel failed to do so.

**{11}** Defendant argues that defense counsel may have felt that a proffer was unnecessary, given that the district court appeared to make its decision on the cost and inconvenience to the State. This argument is unpersuasive. The district court gave defense counsel a clear opportunity to address the relevant prongs of *Belanger* and counsel demurred. Under *Belanger*, Defendant bears the initial burden of proof. *Id.* ¶ 38.

**{12}** *Belanger* also requires the district court to make a finding that the witness's "proffered testimony is admissible, relevant and material to the defense and that without it, his or her ability to fairly present a defense will suffer to a significant degree." *Id.* At trial, defense counsel only stated that Co-defendant's testimony could help the jury resolve alleged discrepancies in the testimony of the State's witnesses. This argument is speculative and fails to address how Defendant's defense would have been prejudiced without Co-defendant's testimony.

**{13}** Although we affirm the district court's ultimate decision to deny Co-defendant witness immunity, we disagree with its apparent reasoning. As noted by Defendant, the district court appeared to make its decision based on the cost and inconvenience to the State. Under *Belanger*, "the [s]tate must demonstrate a persuasive reason that immunity would harm a significant governmental interest." *Id.* Furthermore, a "desire for judicial expediency provides no excuse to short-change a defendant in his [or her] quest for constitutional protection." *Id.* ¶ 55. Therefore, we reiterate that once a defendant meets his or her initial burden, the state must present substantive reasons why witness use immunity should not be granted. *See id.* ¶ 38. We take this opportunity to stress that mere inconvenience to the State is not a persuasive reason for a district court to deny witness use immunity.

## II. THE ADMISSION OF SURROGATE TESTIMONY REGARDING THE VICTIM'S TOXICOLOGY REPORT THROUGH THE STATE'S MEDICAL EXPERT WAS HARMLESS ERROR

**{14}** At trial, Dr. Ross Zumwalt, Chief Medical Investigator for the State of New Mexico, testified that a toxicology report had been performed on the blood and vitreous fluid in Victim's body. He stated that Victim's blood alcohol concentration was .018, which he described as a "small amount" compared to the standard of .08 for driving under the influence. He also said that marijuana metabolites were detected in Victim's blood, indicating that sometime in the past Victim had used marijuana. Finally, Dr. Zumwalt stated that amphetamine and methamphetamine were also found in Victim's body. Dr. Zumwalt testified that the toxicology testing was performed by the Scientific Laboratory Division (SLD) of the New Mexico Department of Health and that the report was signed by Dr. Rong-Jen Hwang, Bureau Chief of the SLD's Toxicology Bureau.

**{15}** At trial, defense counsel objected to Dr. Zumwalt's testimony regarding the toxicology report on confrontation grounds. Arguing that *Crawford v. Washington*, 541 U.S. 36 (2004), requires the analyst who actually performed the test to testify. The district court denied Defendant's motion, concluding that there was no violation of Defendant's confrontation rights.

**{16}** On appeal, Defendant argues that Dr. Zumwalt's testimony regarding Victim's toxicology report violated his constitutional right to confront witnesses because: (1) it was testimonial, (2) it was offered to prove the truth of the matter asserted, (3) no testimony was given stating that Dr. Hwang was unavailable, and (4) Defendant did not have an opportunity to cross-examine Dr. Hwang.

**{17}** Appellate courts review de novo the question of whether the Confrontation Clause has been violated by the admission of hearsay evidence. *State v. Tollardo*, 2012-NMSC-008, ¶ 15, 275 P.3d 110. Confrontation Clause violations are subject to harmless error review. *See State v. Johnson*, 2004-NMSC-029, ¶ 8, 136 N.M. 348, 98 P.3d 998 (stating that non-structural federal constitutional errors are subject to a harmless error analysis).

**{18}** Pursuant to the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This clause bars the admission of out-of-court statements that are "both testimonial and offered to prove the truth of the matter asserted[,] . . . unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant." *State v. Navarette*, 2013-NMSC-003, ¶ 7, 294 P.3d 435. A statement is testimonial when its primary purpose "is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* ¶ 8 (internal quotation marks and citation omitted).

**{19}** Dr. Zumwalt testified that the OMI orders toxicology reports when it feels that drugs or alcohol might be a key factor in a death. The State elicited Dr. Zumwalt's testimony about

Victim's toxicology report to prove that Victim did not die from drug or alcohol use, but rather from gunshot wounds. Because the report was compiled "to establish or prove past events potentially relevant to later criminal prosecution", *id*., we conclude the statements concluded therein were testimonial. Furthermore, the statements concerning toxicity were offered for the truth of the matter asserted (that Victim's cause of death was not alcohol or drugs), the State did not argue that Dr. Hwang was unavailable to testify at trial, and Defendant was not afforded an opportunity to cross-examine him. Therefore, pursuant to *Navarette*, we hold that Dr. Zumwalt's testimony regarding the toxicology reports violated Defendant's confrontation rights under the Sixth Amendment. While we conclude that there was a confrontation violation, we also conclude that the violation was harmless error. *See Tollardo*, 2012-NMSC-008, ¶ 45 ("When a statement is admitted in violation of the Confrontation Clause, we next inquire into whether the error was harmless, and [t]o preclude reversal, the error must be harmless beyond a reasonable doubt." (alteration in original) (internal quotation marks and citation omitted)).

**{20}** Harmless errors are "constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may . . . be deemed harmless, not requiring the automatic reversal of the conviction." *Johnson*, 2004-NMSC-029, ¶ 8 (internal quotation marks and citation omitted). The "'central focus' . . . is 'whether there is a reasonable possibility' . . . that "the erroneous evidence might have affected the jury's verdict.'" *Tollardo*, 2012-NMSC-008, ¶ 40 (quoting *Johnson*, 2004-NMSC-029, ¶ 11). The Court's focus "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Johnson*, 2004-NMSC-029, ¶ 9 (internal quotation marks and citation omitted). "[W]hen reviewing an error's role in the trial, courts may, depending upon the circumstances of the cases before them, examine 'the importance of the [erroneously admitted evidence] in the prosecution's case', as well as 'whether the [error] was cumulative' or instead introduced new facts." *Tollardo*, 2012-NMSC-008, ¶ 43 (alteration in original) (quoting *Johnson*, 2004-NMSC-029, ¶ 11).

**{21}** The State suggests that Dr. Zumwalt's testimony about the toxicology reports was used to confirm that neither alcohol, nor drugs was the cause of Victim's death. Defendant argues that he was prejudiced by the admission of Dr. Zumwalt's testimony because the toxicology report showed Victim's BAC was under the legal limit, thus undermining Defendant's theory that Victim did not resist kidnapping because he was impaired.[1] We review the effects of the Confrontation Clause violation for harmless error on both Defendant's murder conviction and attempted kidnapping conviction. *See Tollardo*, 2012-NMSC-008, ¶ 44 ("[B]ecause an error may be prejudicial with respect to one conviction, but harmless with respect to another, courts must separately assess the effect the error may have

---

[1]The voluntariness of the victim's acts is relevant to the first element of kidnapping, which requires the jury to find that the defendant took or restrained the victim by force, intimidation, or deception. *See* UJI 14-403 NMRA.

had on each of the defendant's convictions.")

**{22}** With respect to the first-degree murder conviction, we hold that it was harmless error to admit the testimonial statements included in the toxicology report. Considering the factors articulated in *Johnson*, we first note that the Victim's toxicity levels were not important to the State's first-degree murder case. While the report affirmatively established that drugs and alcohol were not the cause of death, the State already presented evidence that Victim died of gunshot wounds inflicted by Defendant and Co-defendant. Further, this evidence supported an overwhelmingly strong case that Defendant and Co-defendant intentionally killed Victim. It is unclear why the State even sought to introduce evidence of Victim's toxicity, as relating to his cause of death, particularly when the cause of death was determined to be the gunshot wounds inflicted by Defendant and Co-defendant. Considering the evidence the jury did consider in determining Defendant was guilty of first-degree murder, it is logical to infer that the guilty verdict was rendered despite the improperly admitted statements in the toxicology report. We see no reasonable possibility that its admission contributed to the jury's guilty verdict.

**{23}** Next we turn to the constitutional error's effect on Defendant's attempted kidnapping conviction. Defendant asserts that "[i]f the victim was intoxicated, it was more likely that he was not intimidated into going with [Co-defendant] out to his car and thus not kidnapped." He further asserts that "[t]he toxicology report and testimony tend to show that [Victim] was sober and more likely not an active disputant but rather someone responding to a threat." First, as a practical matter, Defendant's theory that Victim was too impaired to consent would have done little to further his defense. Generally, evidence of intoxication typically serves to defeat a consent defense. *See* 1 Charles E. Torcia, *Wharton's Criminal Law* § 46, at 304 (15th ed. 1993) ("An apparent consent is ineffective if, by reason of . . . intoxication, the victim is unable to make a reasonable judgment as to the nature or harmfulness of the conduct in question, or if, by reason of force, threatened force, or fraud, he is induced to give such consent."). The only relevance that Victim's toxicity would have to a defense would be to show that Victim was indeed sober, thereby had capacity, and *did* consent by voluntarily going outside with Defendant and Co-defendant, which would normally be a defense to kidnapping. *See State v. Sotelo*, 2013-NMCA-028, ¶ 30, 296 P.3d 1232, *cert. denied*, 2013-NMCERT-001, 299 P.3d 863 ("Kidnapping may occur once the [v]ictim's physical association with [the d]efendant [is] no longer voluntary." (alterations in original) (internal quotation marks and citation omitted)). Rather than arguing that he was prejudiced by a showing that Victim was sober, it appears to the Court that he should be arguing that Victim was sober and had capacity.

**{24}** Addressing the *Johnson* factors, we first note that evidence of Victim's toxicity was not important to the State's attempted kidnapping case where it was proffered to establish the cause of death. Further, as discussed above, evidence of Victim's toxicity would have gone to his voluntary consent to walking outside, and evidence of his being closer to sober (and thereby able to consent) would only have helped Defendant's case. Next, other evidence presented at trial tended to show that Victim did not exhibit any substantial level of

7

impairment. For example, Laureles testified that Victim actively resisted Defendant's and Co-defendant's attempts to get Victim to go outside and take off his jewelry. Based on this evidence, and considering that evidence of toxicity went to the element of another crime, we can infer that the jury's verdict was rendered despite the improperly admitted statements in the toxicology report. Again, we see no reasonable possibility that its admission contributed to the jury's guilty verdict.

**{25}** With respect to Defendant's remaining convictions, we cannot see any way in which the statements in the toxicology report could be used as a basis for rendering a guilty verdict. With no logical connection to Victim's toxicity, the guilty verdicts rendered were certainly unattributable to improperly admitted testimonial statements. Accordingly, we hold that the district court's admission of Dr. Zumwalt's testimony regarding the toxicology report was harmless error because we cannot conclude that there is any reasonable possibility that improperly admitted testimony contributed to Defendant's convictions.

## III.   DEFENDANT'S MULTIPLE CONSPIRACY CONVICTIONS VIOLATE DOUBLE JEOPARDY

**{26}** Defendant was convicted on three separate counts of conspiracy: conspiracy to commit first-degree murder, conspiracy to commit robbery, and conspiracy to commit first-degree kidnapping. Defendant argues that these convictions violate his double jeopardy rights under the United States and New Mexico Constitutions. The State concedes Defendant's double jeopardy claim with respect to conspiracy to commit kidnapping and conspiracy to commit robbery. We agree with Defendant and the State and hold that the facts of this case support only one conspiracy, conspiracy to commit first-degree murder.

**{27}** "The defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment." NMSA 1978, § 30-1-10 (1963). In *State v. Gallegos*, 2011-NMSC-027, ¶ 55, 149 N.M. 704, 254 P.3d 655, we held that New Mexico's conspiracy statute establishes "a rebuttable presumption that multiple crimes are the object of only one, overarching, conspiratorial agreement subject to one, severe punishment set at the highest crime conspired to be committed." The State bears a "heavy burden" in overcoming this presumption. *Id.* New Mexico uses "[t]he totality of the circumstances test utilized by the federal circuits . . . to determine the exceptional instances in which the Legislature's presumption of singularity may be overcome by demonstrating the existence of more than one conspiracy." *Id.* ¶ 56. The factors used by the federal circuits to analyze the number of agreements include but are not limited to: (1) whether the conspirators shared a common goal, (2) whether the location of the alleged conspiracies was the same, (3) whether there was a significant degree of temporal overlap between the charged conspiracies, (4) whether there was an overlap of participants between the conspiracies, and (5) whether the role played by the defendant in the alleged conspiracies was similar. *Id.* ¶ 42 (citations omitted).

**{28}** The evidence adduced at trial supports the existence of one conspiracy. Defendant

8

and Co-defendant shared a common goal, to collect a debt from Victim. All three charged conspiracies occurred at or near the residence of Victim's friend and unfolded over a relatively short period of time. Furthermore, the actions of Defendant and Co-defendant overlapped and were mutually dependent. *See id.* ¶ 61. Finally, the three charged conspiracies involved only one victim. *See id.* ¶ 57. Therefore, we hold that there was only one conspiracy and that Defendant's double jeopardy rights were violated. Accordingly, we vacate Defendant's convictions for conspiracy to commit robbery and conspiracy to commit first-degree kidnapping.

## IV. THE JURY WAS PROPERLY INSTRUCTED

{29}    During the preparation of jury instructions in chambers, the district court asked if there were any objections to the following accessory instruction: "The defendant may be found guilty of a crime even though he himself did not do the acts constituting the crime." The State asserted that the instruction should say "murder" instead of "crime." Defense counsel pointed out that UJI 14-2822 NMRA uses the word "crime." The State argued that the instruction should name the crime because the accessory instruction was only intended for the murder count. The district court stated that it planned to change the word "crime" to "murder," but defense counsel objected, arguing that the uniform jury instruction should be followed. Ultimately, and without objection, the district court elected to follow the uniform jury instruction, but to place it immediately following the murder instructions.

{30}    During its deliberations, the jury sent the district court a question asking whether the accessory instruction applied to all counts or only the murder count. The State took the position that the district court could instruct the jury that the accessory instruction only applies to the murder charge. Defense counsel stated that he did not think the jury could be reinstructed under Rule 5-610 NMRA. The district court noted that UJI 14-2822 permits accessory liability for all crimes other than attempt and felony murder and stated that it would be happy to reinstruct the jury or clarify the instruction. Defense counsel evidently declined the offer and the State, apparently reversing its position, stated that it did not think the jury could be reinstructed. Defense counsel then asked the district court for a mistrial, arguing that the jury instructions were flawed and that the jury was confused. The district court stated that the matter had been discussed at some length in formulating the jury instructions, and stated, "So if there is error, in my opinion invited error . . . but I don't think there is error. A fair reading of 14-2822 seems to indicate that it may apply to any charge." At the request of defense counsel, and without objection from the State, the district court sent a note to the jury stating, "You will receive no further instruction."

{31}    Defendant argues that the jury was improperly instructed on accessory liability because accessory liability only should have applied to the murder count. Defendant contends that the district court had a duty to clarify the instruction regardless of the arguments of counsel. We hold that the jury was properly instructed and that any alleged error regarding the accessory instruction was invited error.

**{32}**     Defendant was charged with willful and deliberate first-degree murder. The uniform jury instruction on accessory liability that applies to willful and deliberate first-degree murder, UJI 14-2822, applies to all crimes except attempt and felony murder. *Compare* UJI 14-2820 NMRA (aiding or abetting accessory to attempt); UJI 14-2821 NMRA (aiding or abetting accessory to felony murder). Instruction No. 6 was patterned after UJI 14-2822. Uniform jury instructions are presumed to be correct. *See State v. Wilson*, 1994-NMSC-009, ¶ 5, 116 N.M. 793, 867 P.2d 1175. Nevertheless, as pointed out by Defendant, the State intended accessory liability to only apply to the murder charge.

**{33}**     Defendant asks us to review the accessory jury instruction for fundamental error under *State v. Foxen*, 2001-NMCA-061, ¶ 12, 130 N.M. 670, 29 P.3d 1071. In *Foxen*, the Court of Appeals held that it would review deficient jury instructions resulting from oversight or neglect for fundamental error. *Id.* Defendant argues that the deficient jury instruction in his case was a result of oversight or neglect because his attorney was "mistaken about the law."

**{34}**     Defendant's case is distinguishable from *Foxen*. The jury instruction on accessory liability in Defendant's case was the result of invited error, not oversight or neglect. "The doctrine of fundamental error cannot be invoked to remedy the defendant's own invited mistakes." *State v. Campos*, 1996-NMSC-043, ¶ 47, 122 N.M. 148, 921 P .2d 1266. New Mexico courts "have consistently followed the ethical maxim that no party can profit by his own wrong." *Proper v. Mowry*, 1977-NMCA-080, ¶ 69, 90 N.M. 710, 568 P.2d 236 (internal quotation marks and citations omitted) (holding that a jury instruction stating that defendant in a slander action must have entertained serious doubts as to the statements was invited error). A party may not be rewarded with a new trial when it invites jury instruction error and subsequently complains about that very error. *See Estate of Gutierrez ex rel. Jaramillo v. Meteor Monument, L.L.C.*, 2012-NMSC-004, ¶ 34, 274 P.3d 97 (holding that an error in a jury instruction concerning the scope of employment in a negligent supervision case was invited and did not entitle the defendant to a new trial).

**{35}**     Defense counsel invited error in the jury instructions in two respects. First, he objected to the State's proposed modification of the jury instruction during the formulation of the instructions. Second, he objected to reinstructing the jury after the jury expressed confusion about the application of the accessory instruction. Defense counsel was mistaken about the law in this regard. "The decision to issue additional jury instructions generally lies within the sound discretion of the [district] court." *State v. Juan*, 2010-NMSC-041, ¶ 16, 148 N.M. 747, 242 P.3d 314; *see also* Rule 5-610(A) (stating that if the jury desires additional instructions "they may in the discretion of the court be returned to the courtroom and the court may give them such additional instructions"). Therefore, we hold that defense counsel invited any alleged error in the jury instructions.

**V.     DEFENDANT WAS NOT PREJUDICED BY THE STATE'S FAILURE TO DISCLOSE THE VICTIM'S TOXICOLOGY REPORT AND THE FULL BALLISTICS REPORT**

10

### A. The Toxicology Report

**{36}** During the testimony of Dr. Zumwalt, defense counsel noticed that Dr. Zumwalt was looking at the victim's file which included a toxicology report. After defense counsel raised the issue, the district court gave him an opportunity to copy the portions of the file to which Dr. Zumwalt was referring. Defense counsel asked to be heard in chambers.

**{37}** In chambers, defense counsel objected that the toxicology report to which Dr. Zumwalt was referring differed from the report he had previously received in discovery. Defense counsel stated that the new report had not been disclosed under Rule 5-501(A)(4) NMRA and asked for a mistrial. Defense counsel argued that Defendant was prejudiced by the State's non-disclosure because without the reports "we don't know which way we can argue or whether we can use this as part of our case." The State replied that defense counsel could have contacted Dr. Zumwalt and requested to interview him and review his files. The district court denied Defendant's motion for a mistrial.

### B. The Ballistics Report

**{38}** At trial, the State called Kevin Streine, a firearms and tool mark examiner for the New Mexico Department of Public Safety. Without objection, the district court recognized Streine as an expert witness in firearms and tool mark analysis. Streine testified that the OMI sent him three bullets recovered from Victim's body, one of which was fragmented into two pieces. Streine stated that when an item is received by the lab, it is weighed, and he does not rely on OMI's weights. Streine identified two of the bullets as .32 caliber. As for the two fragments, Streine testified that he could not determine their caliber, but he did identify them as being fired from the same gun as the .32 caliber bullets.

**{39}** Streine also received four shell casings from the Hobbs Police Department which were collected from the crime scene. Streine determined that all four casings were .32 caliber and were fired from the same firearm. He testified that without the firearm in question, he could not say whether the bullets and casings were fired from the same firearm.

**{40}** Finally, Streine received another bullet and additional fragments from the Hobbs Police Department which had been recovered from the victim's car. He identified the bullet and fragments as nominally .38 caliber. Streine stated that he used the bullet and fragment weights to determine the caliber.

**{41}** During Streine's testimony, defense counsel noticed that he was referring to notes. Defense counsel brought this to the attention of the district court, and the district court took a recess to give defense counsel an opportunity to see the notes. In chambers, defense counsel stated that the two-page report he received in discovery did not contain the weights of the bullets, yet Streine was referring to a thirty-three-page document during his testimony that did contain the weights of the bullets. Defense counsel objected that under Rule 5-501 the material should have been provided during discovery to give the defense a fair

opportunity to review the material prior to trial. Defense counsel stated that the report might contain exculpatory evidence and cited *Brady v. Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 514 U.S. 419 (1995). On this basis, defense counsel again moved for a mistrial. The State responded that defense counsel had not attempted to contact Streine for an interview and could have done so either directly or through the district attorney's office. Streine confirmed in chambers that he had not been contacted by or visited with defense counsel prior to the start of trial. The district court conditionally denied Defendant's motion but asked for briefing. Following briefing, the district court continued to reserve judgment on this issue.

### C.  Discussion

**{42}**  Defendant alleges that the State violated its duty to disclose by not providing the defense with the reports relied upon by Dr. Zumwalt and Streine during their testimony at trial. Defendant argues that under Rule 5-501(A)(4) and *Brady*, these documents should have been disclosed to the defense. Defendant asserts that he was prejudiced by the State's non-disclosure of Streine's thirty-three-page report because it included important information regarding the weights of the bullets that was not included in the two-page document previously disclosed to the defense. Defendant argues that because Streine's report was not disclosed, he was unable to effectively cross-examine Streine.

**{43}**  On review, a defendant bears the burden of proving he was prejudiced by non-disclosure of evidence. *State v. Hernandez*, 1993-NMSC-007, ¶ 63, 115 N.M. 6, 846 P.2d 312. When evidence is disclosed for the first time during trial, we

> must consider the following factors to determine whether the error is reversible: (1) whether the State breached some duty or intentionally deprived the defendant of evidence; (2) whether the improperly non-disclosed evidence was material; (3) whether the non-disclosure of the evidence prejudiced the defendant; and (4) whether the trial court cured the failure to timely disclose the evidence.

*State v. Mora*, 1997-NMSC-060, ¶ 43, 124 N.M. 346, 950 P.2d 789, *abrogation on other grounds recognized by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683.

**{44}**  As a preliminary matter, we must note that Defendant failed to designate the toxicology report and ballistics report as exhibits under Rule 12-212(A) NMRA, a fact noted by the State in oral argument. The absence of these documents in the record detracts from Defendant's claims regarding their importance. *See State v. Garcia*, 1978-NMCA-109, ¶ 4, 92 N.M. 730, 594 P.2d 1186 (stating that "the burden is on the appellant . . . to provide the necessary appellate record" of transcript and exhibits).

**{45}**  Under Rule 5-501(A)(4), the State has a duty to disclose "any results or reports of

12

. . . scientific tests or experiments . . . made in connection with the particular case, or copies thereof, within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known to the prosecutor." If a party discovers additional material subject to disclosure after its initial disclosure, that party must give written notice to the other party of the existence of the additional materials. *See* Rule 5-505(A) NMRA.

**{46}**     The record in this matter reflects that the defense requested discovery under Rule 5-501 on at least two occasions. On March 9, 2010, the public defender entered an appearance on behalf of Defendant in the magistrate court matter, which was bound over to district court, and requested timely disclosure of the materials enumerated in Rule 5-501. On May 12, 2010, the public defender entered an appearance on behalf of Defendant in the district court proceeding and made the same request for discovery. Both requests were accompanied with a demand for the preservation of "original and edited notes, reports, memoranda, summaries or any other records related in any way to defendant."

**{47}**     The toxicology report relied upon by Dr. Zumwalt and the ballistics report relied upon by Streine would qualify as scientific tests or experiments. Although the State characterizes Streine's report as case notes, the report was contemplated in the defense's request to preserve original and edited notes and reports. Since both Dr. Zumwalt and Streine were employed by the State at the time of the trial, the toxicology and ballistics reports are presumed to be within the control of the prosecutor. *See Hernandez*, 1993-NMSC-007, ¶ 63 ("Information within the custody or control of an agent of the State is presumed to be within the control of the prosecutor."). In addition, the reports could have become known to the prosecutor through "the exercise of due diligence." Rule 5-501(A)(4). Therefore, we conclude that under the first prong of *Mora*, the State breached its duty to disclose. 1997-NMSC-060, ¶ 43.

**{48}**     Under the second prong of *Mora*, we conclude that the toxicology and ballistics reports were material. The toxicology report was material because it was relevant to the issue of whether Victim resisted Defendant's attempt to kidnap him. The ballistics report was material because it was relevant to the issue of who fired the shots that killed Victim.

**{49}**     Although we believe that the defense should have been provided the reports relied upon by Dr. Zumwalt and Streine, we hold under the third prong of *Mora* that Defendant did not suffer any prejudice from the State's failure to disclose. *Id.* Defendant makes no assertion as to how any difference in the reports used at trial and those provided during discovery would have changed the outcome of his case. As discussed, the toxicology report would not have materially altered his defense. The second ballistics report, which apparently contained specific bullet weights, would not have changed the outcome of Defendant's murder conviction. Regardless of the bullet weights, which would presumably establish which gun actually killed Victim, the jury had ample evidence to convict Defendant of first-degree murder, even if the bullets did not come from his gun. *See* NMSA 1978, § 30-1-13 (1972) ("A person may be charged with and convicted of the crime as an accessory if he

13

procures, counsels, aids or abets in its commission and although he did not directly commit the crime . . . ."); *State v. Carrasco*, 1997-NMSC-047, ¶ 6, 124 N.M. 64, 946 P.2d 1075 ("A person who aids or abets in the commission of a crime is equally culpable as the principal. Aiding and abetting is not a distinct offense and it carries the same punishment as a principal." (internal citation omitted)). Finally, as noted in *State v. Hovey*, 1987-NMSC-080, ¶ 10, 106 N.M. 300, 742 P.2d 512, a mistrial is not appropriate where the raw data relied upon by the expert at trial was available to defense counsel and defense counsel failed to request it.

**{50}** Under the fourth prong of *Mora*, we conclude that the district court timely cured the State's failure to disclose. 1997-NMSC-060, ¶ 43. Defense counsel acknowledged talking with Streine on a break from trial and asking him about the weight of the bullets. Nevertheless, we are concerned about the amount of time defense counsel had to review this evidence at trial. The record reflects that following Defendant's objection, the district court recessed for approximately fifty-three minutes, of which about thirty-six minutes was spent in chambers with the attorneys arguing about the non-disclosure. Therefore, defense counsel only had around 17 minutes to meet with Streine and review Streine's notes. In most circumstances, this would not be a sufficient amount of time to read and digest lengthy scientific documentation and to prepare an adequate cross-examination.

**{51}** The foregoing concern notwithstanding, defense counsel should have asked for more information from the State. In fact, it is a common practice for attorneys to ask experts for the underlying notes or reports from experts. We take this opportunity to stress that defense attorneys are entitled to go to the OMI independently, without authorization from the State, and to interview OMI personnel. As a matter of practice, medical examiners will freely talk to defense counsel. This is part of the job of a medical investigator. Although there is always a risk of prejudice in not disclosing such evidence, in this case we conclude that Defendant was not prejudiced by the non-disclosure of the expert reports.

## VI.    THERE WAS NO CUMULATIVE ERROR

**{52}** Defendant argues that he did not receive a fair trial, and therefore his convictions should be reversed due to cumulative error. In support of his claim of cumulative error, Defendant merely repeats the arguments raised in his appeal.

**{53}** "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61. As discussed in the previous sections, the errors committed by the district court were harmless, and thus do not call into question the decision of the jury. We hold that there was no cumulative error.

## VII.    DEFENDANT HAS NOT ESTABLISHED THAT DEFENSE COUNSEL WAS INEFFECTIVE

**{54}** Defendant argues that his counsel at trial was constitutionally ineffective under the record established in this case. Defendant asserts that defense counsel demonstrated deficient performance in failing to interview or investigate the State's expert witnesses, including Dr. Zumwalt and Streine.[2] Defendant claims that he was prejudiced by defense counsel's failure to investigate because Dr. Zumwalt and Streine's testimonies undermined the defense's theory of the case. In particular, Defendant claims that Streine's testimony undermined his attempt to rebut the testimony of eyewitness Laureles, who testified that both Defendant and Co-defendant were shooters. He also noted that Dr. Zumwalt's testimony was important to deciding the issue of whether the victim's acts were voluntary or coerced.

**{55}** "When a claim of ineffective assistance of counsel is first raised on direct appeal, we evaluate the facts that are part of the record." *Roybal*, 2002-NMSC-027, ¶ 19. In evaluating ineffective assistance of counsel claims, New Mexico follows the test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Roybal*, 2002-NMSC-027, ¶ 19. The defendant must first show that counsel's performance fell below that of a reasonably competent attorney. *Strickland*, 466 U.S. at 687. The defendant must then show that he was prejudiced by counsel's deficient performance. *Id*. "A prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct." *Lytle v. Jordan*, 2001-NMSC-016, ¶ 26, 130 N.M. 198, 22 P.3d 666 (internal quotation marks and citation omitted). "[I]n order to satisfy the prejudice prong, it is necessary to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Patterson v. LeMaster*, 2001-NMSC-013, ¶ 28, 130 N.M. 179, 21 P.3d 1032 (internal quotation marks and citations omitted).

**{56}** Defendant has failed to make a prima facie case of ineffective assistance of counsel. The record before us supports a showing that defense counsel made a strategic decision not to interview Dr. Zumwalt and Streine. Any information that was likely to be gleaned from interviewing these witnesses would unlikely be helpful to Defendant's case, or otherwise change the outcome of his convictions. We can safely presume that defense counsel was apprised of this and made a tactical decision to forgo the interviews. "On appeal, we will not second guess the trial strategy and tactics of the defense counsel." *State v. Gonzales*, 1992-NMSC-003, ¶ 32, 113 N.M. 221, 824 P.2d 1023, *overruled on other grounds by State v. Montoya*, 2013-NMSC-020, ¶ 2, 306 P.3d 426.

**{57}** Defendant argues that "No plausible, rational strategy explains counsel's conduct." He states that defense counsel was surprised by the testimonies of Dr. Zumwalt and Streine and that his counsel's failure to contact or interview either witness served no purpose to the

---

[2]Defendant also argues that his counsel was ineffective for failing to raise double jeopardy. This claim is moot. Because we vacate Defendant's convictions for conspiracy to commit robbery and conspiracy to commit first-degree kidnapping, Defendant cannot demonstrate prejudice, thus invalidating his claim of ineffective assistance of counsel.

defense. This argument is speculative and lacks support in the record. "Without such prima facie evidence, the Court presumes that defense counsel's performance fell within the range of reasonable representation." *State v. Arrendondo*, 2012-NMSC-013, ¶ 38, 278 P.3d 517. Even if we were to assume that defense counsel was deficient, Defendant cannot demonstrate prejudice.

**{58}** To demonstrate prejudice, Defendant must show that had his counsel interviewed Dr. Zumwalt and Streine and obtained the toxicology and ballistics reports they relied upon, the result of his trial would have been different. Defendant cannot make that showing. There is sufficient evidence in the record to support Defendant's conviction for murder. Laureles and another eyewitness testified to their direct observations of the shooting, and additional witnesses testified in a corroborative manner regarding events leading to and immediately following the shooting.

**{59}** Defendant makes two other ineffective assistance of counsel claims, namely that defense counsel's failure to interview witnesses negatively affected plea bargaining and that his counsel did not create an adequate record regarding witness use immunity for Co-defendant. Both arguments lack support in the record. Defendant's argument regarding plea bargaining is purely speculative. As noted by Defendant, the record does not reflect the history of any plea negotiations. We decline to consider Defendant's argument that his attorney did not create an adequate record because Defendant cites no authority in support of this argument. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (holding that an appellate court will not consider an issue if no authority is cited in support of the issue).

**{60}** Because the record is not sufficient to establish whether the actions taken by defense counsel were reasonable, "this Court prefers that these claims be brought under habeas corpus proceedings so that the defendant may actually develop the record with respect to defense counsel's actions." *Arrendendo*, 2012-NMSC-013, ¶ 38.

## CONCLUSION

**{61}** We affirm Defendant's convictions for first-degree murder and conspiracy to commit first-degree murder. We vacate Defendant's convictions for conspiracy to commit kidnapping and conspiracy to commit robbery on double jeopardy grounds. We remand to the district court to re-sentence Defendant accordingly.

**{62}** **IT IS SO ORDERED.**

_____
**BARBARA J. VIGIL, Chief Justice**

**WE CONCUR:**

16

_____
**PETRA JIMENEZ MAES, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**


_____
**CHARLES W. DANIELS, Justice**